323 F.2d 422
 CONSTRUCTION, PRODUCTION & MAINTENANCE LABORERS UNION, LOCAL 383, AFL-CIO, and United Brotherhood of Carpenters and Joiners of America, Local 1089, AFL-CIO, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
INDEPENDENT CONTRACTORS ASSOCIATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 18217.
 No. 18293.
 United States Court of Appeals Ninth Circuit.
 September 26, 1963.
 
 Minne & Sorenson, and Anderson D. Ward, Phoenix, Ariz., for petitioners Construction, Production and Maintenance Labors Union, Local No. 383, etc., and others.
 Shimmel, Hill, Kleindienst & Bishop, and Daniel Gruender, Phoenix, Ariz., for petitioners Independent Contractors Assoc.
 Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, and Janet Kohn, Attys. N.L.R.B., Washington, D. C., for respondent.
 Before MERRILL and DUNIWAY, Circuit Judges, and TAYLOR, District Judge.
 MERRILL, Circuit Judge.
 
 
 1
 This consolidated case is before us on petitions for review of an order of the National Labor Relations Board, issued July 26, 1962, and reported at 137 NLRB No. 149. Proceedings were initiated by a charge filed against the union petitioners by Independent Contractors Association representing the affected employer, Colson and Stevens Construction Company of Phoenix, Arizona. The Board order was entered against the union petitioners, determining that they had violated the National Labor Relations Act by engaging in unlawful picketing and ordering them to cease and desist therefrom. The unions seek reversal of the order and dismissal of the proceedings. The order also dismissed the complaint as to certain alleged violations, and as to this portion of the order the Association, as petitioner, seeks reversal.
 
 
 2
 The picketing occurred at job sites in Phoenix at which Colson and Stevens was engaged in construction work as general contractor. The purpose of the picketing was to secure a collective-bargaining agreement with Colson and Stevens, which proposed agreement contained the following clause:
 
 
 3
 "That if the Contractors, parties hereto shall subcontract construction work * * * the terms of said Agreement shall extend to and bind such construction subcontract work, and provisions shall be made in such subcontract for the observance by said subcontractor of the terms of this Agreement."
 
 
 4
 During the picketing, and at each site picketed, Colson and Stevens had existing subcontracts with nonunion subcontractors for construction work covered by the terms of the above clause of the proposed bargaining agreement, and for at least several months these subcontractors frequently did work on various jobs for Colson and Stevens.
 
 
 5
 The Board by its order held that in picketing for such a contract clause the unions had violated subsections (A) and (B) of § 8(b) (4) of the Act, 29 U.S.C. § 158(b) (4) (A) and (B), which render unlawful secondary boycotts and so-called hot-cargo agreements. These subsections prohibit strikes, concerted refusals to handle goods or perform services and (through inclusion of "coerce" in the proscribed methods) picketing, where an object is "(A) forcing or requiring any employer * * * to enter into any agreement which is prohibited by Subsection (e) of this section * * * (B) forcing or requiring any person * * * to cease doing business with any other person * * *."
 
 
 6
 Section 8(e), 29 U.S.C. § 158(e), to which § 8(b) (4) (A) refers, generally makes it unlawful for a labor organization to enter into hot-cargo agreements and other agreements which require an employer to cease doing business with any other person. The section, however, contains the following proviso:
 
 
 7
 "Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, * * *."
 
 
 8
 The unions here contend that this proviso renders § 8(b) (4) (A) inapplicable to their picketing of this employer; and that § 8(b) (4) (B) has no application to picketing in order to secure agreements to cease doing business with any person. We agree.
 
 
 9
 As to § 8(b) (4) (A), the Board's position is that the § 8(e) proviso must be construed as applying only to agreements voluntarily entered into; that while such an agreement is not unlawful under § 8 (e) when voluntarily reached, picketing to secure it is unlawful under § 8(b) (4) (A).
 
 
 10
 It may well be that § 8(e) itself is addressed only to voluntary agreements; it is not § 8(e) but § 8(b) (4) (A) which prohibits coercion. However, (A) prohibits it only where the object of the coercion is an agreement which is "prohibited" by § 8(e) from voluntarily being reached. The effect of the proviso is to exclude from that prohibition the subcontracting clause here at issue, and the two sections read together, as they are intended to be read, say most clearly that if such an agreement may voluntarily be reached, picketing to secure it is not made unlawful.
 
 
 11
 The Board protests that the legislative history supports their construction. We cannot agree.
 
 
 12
 As the Board points out, § 8(b) (4) in its present form results from an amendment in 1959. The former provision, applicable to secondary boycotts, prohibited strikes and employee boycotts the object of which was "forcing or requiring * * any employer or other person * * * to cease doing business with any other person." The quoted language is substantially carried over into the present § 8(b) (4) (B). The amendment, which added § 8(b) (4) (A) was intended to plug a loophole disclosed by the Supreme Court in Local 1976 United Brotherhood of Carpenters and Joiners of America, A. F.L. v. N.L.R.B. (1957) 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186, commonly known as the Sand Door case There the Supreme Court held that while an agreement to cease doing business with others (to whom the contracting union objected) could not be enforced by strikes or other means prohibited by § 8(b) (4), an employer may voluntarily sanction and support a boycott, and hence his agreement to do so is not unlawful.
 
 
 13
 This court in N. L. R. B. v. Amalgamated Lithographers of America (9 Cir., 1962), 309 F.2d 31, 39, f. n. 12; cert. denied (1963) 372 U.S. 943, 83 S.Ct. 936, 9 L.Ed.2d 968, has recognized that:
 
 
 14
 "It was this decision which motivated Congress to enact the 1959 amendments which added section 8 (e), outlawing agreements to engage in secondary boycotts, and added language to section 8(b) (4) (A) making it an unfair labor practice for a union to strike or engage in other coercive activity for the purpose of forcing an employer to enter into an agreement of the kind described in section 8(e). See 2 Leg. Hist. of the Labor-Management Reporting and Disclosure Act of 1959 (Govt.Print.Office, 1959), 1707-1709."
 
 
 15
 Section 8(e) includes not only the construction industry proviso, but also one relating to the apparel and clothing industry. The two provisos differ markedly in their phraseology and scope. The latter by its language exempts the garment industry from the application of both § 8(e) and § 8(b) (4) (B).
 
 
 16
 The Board seizes upon this distinction as evidence of a legislative intent that while picketing to secure an agreement to cease doing business is permissible in the garment industry it is not in the construction industry. We disagree.
 
 
 17
 The result of the garment industry proviso is to permit (in that industry) picketing not only to secure an agreement but also to enforce it. Reference in the proviso to subsection (B) of § 8(b) (4) was necessary if enforcement picketing was to be made lawful, since it is subsection (B) which now proscribes it and since that subsection operates independent of subsection (e).
 
 
 18
 If, by contrast, it had been intended that picketing to enforce construction subcontracting agreements is not to be permitted but picketing to secure such agreements is to be permitted, it was not necessary for the construction proviso of subsection 8(e) to refer also to subsection (B), which was aimed at enforcement, or to subsection (A), which is dependent for its operation upon unlawfulness under subsection 8(e). That this was the intended operation of the construction proviso is suggested by a statement by Senator Kennedy, made during debate on the bill, in reference to that proviso:
 
 
 19
 "Since the proviso does not relate to § 8(b) (4), strikes and picketing to enforce the contracts excepted by the proviso will continue to be illegal under § 8(b) (4) whenever the Sand Door case (357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186) is applicable." 2 Leg.Hist. of the Labor-Management Reporting and Disclosure Act of 1959 (Govt.Print. Office, 1959), 1433.
 
 
 20
 The result is that § 8(b) (4) in conjunction with § 8(e) provides three degrees of permissibility respecting picketing in connection with agreements to cease doing business with certain persons: (1) As to the garment industry, picketing to secure and to enforce is permissible; (2) as to the construction industry, picketing to secure is permissible but (under § 8(b) (4) (B)) picketing to enforce is proscribed; (3) as to all other industries, picketing both to secure and to enforce is proscribed.
 
 
 21
 The Board also suggests that by analogy the legislative history of § 8(f) be applied to the relation between § 8(b) (4) (A) and § 8(e). Section 8(f) makes certain prehire collective-bargaining agreements, otherwise unlawful under the Act, permissible in the construction industry; but the legislative history contains statements specifically disclaiming an intention thereby to authorize strikes or picketing to coerce such prehire agreements. This demonstrates, the Board argues, that Congress had a similar intention with respect to agreements legalized by the construction proviso to § 8(e).
 
 
 22
 This contention, however, ignores the basic fact that the picketing here at issue is controlled by § 8(b) (4) (A), the operation of which expressly depends on unlawfulness under § 8(e).
 
 
 23
 Finally, the Board attempts to support its construction by pointing to statements in the legislative history that the proviso "is not intended to change the law with respect to * * * the legality of a strike to obtain such a contract."[1] It argues that this adopts by implication as the "existing law" the decision in N. L. R. B. v. Local 47, International Brotherhood of Teamsters (5 Cir., 1956), 234 F.2d 296. That case held violative of the former secondary boycott provisions picketing of general construction contractors to force their acceptance of a clause requiring subcontractors to assume the terms of the union contract.
 
 
 24
 We cannot agree that that ruling constituted "existing law" in the view of Congress. The phrase quoted from the legislative history is obviously vague and ambiguous. The Local 47 decision is nowhere cited in the legislative history of the 1959 amendments. To refer to it as "existing law" seems exaggerated to say the least, since it is the only case dealing with this issue and since it preceded the Sand Door case and was not mentioned in the Supreme Court's opinion in that case. Moreover, it is distinguishable in that there was evidence demonstrating a specific intent of the picketing unions to force immediate termination of relations with certain nonunion subcontractors.
 
 
 25
 We thus conclude that the legislative history gives no warrant for overriding the clear apparent meaning of subsection 8(b) (4) (A). Picketing to secure an agreement to cease doing business with certain persons is not made unlawful by this section where that agreement is within the construction proviso of § 8(e). The same conclusion has been reached by district courts which have considered this question. Cuneo v. Essex County & Vicinity District Council of Carpenters (D.N.J.1962) 207 F.Supp. 932; LeBus for and on Behalf of N. L. R. B. v. Local 60, United Ass'n. of Journeymen (E.D.La.1961) 193 F.Supp. 392.
 
 
 26
 The Board contends that even if subsection (A) has not been violated, subsection (B) of § 8(b) (4) prohibits picketing for such an agreement where the affected employer to comply with the agreement would be required to terminate existing contractual or business relationships with persons who would not agree to accept the terms of the bargaining contract. Agreement under these circumstances, says the Board, is tantamount to an actual cessation of business relationships.
 
 
 27
 We cannot agree. The language of the Sand Door case, though containing no intimation on the legality of coercion to secure an agreement to cease doing business, clearly recognizes a definite distinction between such agreements and the cessation itself.[2]
 
 
 28
 Similar recognition appears in Senator Kennedy's statement, supra, that "strikes and picketing to enforce the contracts excepted by the [construction] proviso will continue to be illegal under § 8(b) (4) whenever the Sand Door case (357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186) is applicable." Indeed, this implies that it was not contemplated that illegality would extend to picketing which is to secure, rather than to enforce, such agreements.
 
 
 29
 To bolster its contention that despite this distinction § 8(b) (4) (B) applies, the Board again relies on the statements in legislative history that existing law on the "legality of a strike to obtain such a contract" would be preserved, and on the case of N. L. R. B. v. Local 47, supra, which, it reminds us, was decided under the provision now carried forward into subsection (B).
 
 
 30
 Again, however, we find that this history is too inconclusive to support an inference that Congress intended that subsection (B) proscribe picketing to secure agreements to cease doing business. To the contrary, Congressional history seems to us to demonstrate an intent that subsection (B) shall not relate to agreements to cease.
 
 
 31
 At the same time that it adopted the § 8(b) (4) (A) clause, the conference committee dropped the phrase "or agree to cease" from the house version of amended § 8(b) (4) (B). That version had read "forcing or requiring any person * * * to cease or agree to cease doing business * * *." Explaining this deletion, the house managers stated in their report accompanying the conference bill that the restrictions thereby imposed "were included in the other provisions dealing with prohibitions against entering into `hot cargo' agreements and, therefore, their retention in Section 8(b) (4) (B) would constitute a duplication of language." H.R.Rep.No.1147 on S.1555, 86th Cong., 1st Sess., p. 38; 1 Leg.Hist. of the Labor-Management Reporting and Disclosure Act of 1959 (Govt.Print. Office 1959) 942.
 
 
 32
 The clear implication is that only subsection (A) deals with picketing to secure agreements to cease, and from this follows the more rational construction that if subsection (A), which deals directly with this type of picketing does not make it unlawful in a particular case it will not be made unlawful by subsection (B).[3]
 
 
 33
 We conclude that neither subsection (A) nor (B) of § 8(b) (4) proscribes the picketing of the unions in this case.
 
 
 34
 The Board's order is reversed and the case is remanded with instructions that proceedings against the unions be dismissed.
 
 
 35
 The Association's petition seeks review of that portion of the Board's order dismissing their charge that the unions had violated § 8(b) (7) (C), 29 U.S.C. § 158 (b) (7) (C), by picketing for a period in excess of that which the section permits.[4]
 
 
 36
 Each of the two unions had picketed the employer and at a different time. The Association contends that the unions acted jointly and in concert and that the combined period exceeded the time permitted. The Board ruled that "the record does not preponderantly establish such joint action." Before us, the Association contends, in effect, that such joint action is conclusively established by virtue of the fact that each union was picketing to secure precisely the same contract — the "Arizona Master Labor Agreement."
 
 
 37
 We agree with the Board that the test of joint action in this respect is not whether common objectives are sought, but whether the picketing itself was joint, and the result of a joint campaign.
 
 
 38
 Upon the whole record it cannot be said that the Board's determination that the record did not establish such a joint campaign was without substantial support. Upon the petition of the Association, the Board is affirmed.
 
 
 
 Notes:
 
 
 [1]
 Statement of Senator Kennedy, 2 Leg. Hist. of the Labor-Management Reporting and Disclosure Act of 1959 (Govt.Print. Office 1959) 1433; H.R.Rep. No. 1147, 86th Cong., 1st Sess., 1 Leg.Hist. 943-944
 
 
 [2]
 The court distinguished between the employer's choice whether to refuse to deal with another arising "at the time the question whether to boycott or not arises in a concrete situation" — which choice it held must be free — and such a choice arising "merely at the time a collective bargaining agreement is drawn up covering a multitude of subjects, often in a general and abstract manner." 357 U.S. at 105, 106, 78 S.Ct. at 1019, 1020, 2 L.Ed.2d 1186. The last-quoted language quite appropriately describes the choice that was presented to Colson and Stevens in this case
 
 
 [3]
 The same conclusion was reached in Cuneo for and on Behalf of N. L. R. B. v. International Union of Operating Engineers (D.N.J.1963) 216 F.Supp. 173, 175
 
 
 [4]
 The section makes it an unfair labor practice for a union to picket for recognitional purposes for more than a reasonable period of time, not to exceed thirty days, without filing a petition for an election under § 9(c), 29 U.S.C. § 159 (c)