**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MUSKEGON BRICKLAYERS UNION NO. 5, BRICKLAYERS, MASONS AND PLASTERERS INTERNATIONAL UNION OF AMERICA, AFL–CIO, Respondent.**

**No. 16886.**

United States Court of Appeals
Sixth Circuit.
June 15, 1967.

Gary Green, N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Martin R. Ganzglass, Attys., N. L. R. B., Washington, D. C., on brief, for petitioner.

Jerry S. McCroskey, Muskegon, Mich., Marcus, McCroskey, Libner, Reamon, Williams & Dilley, Darryl R. Cochrane, Muskegon, Mich., on brief, for respondent.

Before EDWARDS, CELEBREZZE and PECK, Circuit Judges.

EDWARDS, Circuit Judge.

The National Labor Relations Board found that respondent, by insisting upon what it found to be a prohibited (secondary boycott) clause and by striking to obtain it, had violated Section 8(b) (3) and Sections 8(b) (4) (i) and (ii) (A) of the National Labor Relations Act, 29 U.S.C. § 158(b) (3) and (b) (4) (i) and (ii) (A) (1964). The Board seeks this court's enforcement of its cease and desist order.

This case was heard on a stipulated record. Since April 18, 1964, respondent union has insisted in its negotiations with the Greater Muskegon General Contractors Association on the inclusion of the following clause:

"It is agreed that the members of the Bricklayers Local Union #5 may refuse to work on any job where any of the work, irrespective of craft, is performed, has been performed, or is to be performed by craftsmen who enjoy less favorable wages and working conditions than is provided in the current collective-bargaining agreement between the equivalent Muskegon County

Building Trades Local Union and its contracting employers. Such refusal shall not be grounds for discharge or other disciplinary action, but shall be regarded as a failure of the employer to provide suitable work."

On refusal of this demand, the union struck and picketed job sites, resulting in a petition for injunction; and an injunction was ultimately issued by a United States District Judge.

The NLRB claims the clause just set forth is just the sort of "hot cargo" clause which the Taft-Hartley Act in § 8(b) (4) (A) and the Landrum-Griffin Act in § 8(e) were designed to make illegal. Respondent relied, however, upon the proviso in said Sec. 8(e) exempting the construction industry from its effect. 29 U.S.C. § 158(e) (1964).

It is respondent's position that Sec. 8 (e) was passed by Congress squarely to reverse the Sand Door decision, Local 1976, United Brotherhood of Carpenters & Joiners of America, AFL v. N.L.R.B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958), but that the proviso exempting the construction industry left Sand Door the ruling case law in the present situation.

Respondent also cites and relies upon N.L.R.B. v. Local 217, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the U. S. and Canada, AFL-CIO, 361 F. 2d 160 (C.A. 1, 1966). In this case the First Circuit in dictum held a somewhat different provision to be legal on the ground that the clause did not automatically contemplate union inducement to strike.

The Board's position is that this clause is a typical "hot cargo" clause, such as are banned by Sec. 8(e) but that unions in the construction industry under the proviso are permitted to enter into "hot cargo" clauses "which contemplate enforcement only through the judicial process." The National Labor Relations Board claims the instant clause sanctions strikes thereby violating the congressional scheme. The NLRB relies upon

Orange Belt District Council of Painters No. 48, AFL-CIO v. N.L.R.B., 117 U.S. App.D.C. 233, 328 F.2d 534 (1964); N. L.R.B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S. Ct. 943, 95 L.Ed. 1284 (1951); Construction, Production & Maintenance Laborers Union, Local 383, AFL-CIO v. N.L.R.B., 323 F.2d 422 (C.A. 9, 1963), and a recent Sixth Circuit case, N.L.R.B. v. International Brotherhood of Electrical Workers, Local Union No. 683, AFL-CIO, 359 F.2d 385 (C.A. 6, 1966).

In finding the instant clause unlawful under Sec. 8(e) the Board reasoned:

"An employer's agreement with a labor organization permitting employees to refuse to work in the event the employer does business with another employer considered objectionable by the labor organization is in practical effect the equivalent of an agreement by the employer not to do business with other employers within the meaning of Section 8(e). The Board and the courts have so held. [Truck Drivers Local 413 v. N.L.R.B., 118 U.S.App.D.C. 149, 334 F.2d 539, 543 (1964), cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964); Los Angeles Mailers Union No. 9 v. N.L.R.B., 114 U.S.App.D.C. 72, 311 F. 2d 121 (1962)]. Further, it is not the type of clause 'which merely requires subcontractors to meet the equivalent of union standards in order to protect the work standards of the employees of the contracting employer,' which has been held to be lawful. [Truck Drivers Local 413 v. N.L.R.B., supra, 334 F.2d at 548; Orange Belt District Council v. N.L.R.B., 328 F.2d 534, 538 (C.A.D.C. 1964)]." (Footnotes omitted.)

In finding that the union conduct was not rendered legal by the Sec. 8(e) proviso, the Board found:

"Accordingly, we hold that where, as in this case, a limitation upon contracting at a construction site is intertwined with a provision permitting such self-help as striking or otherwise refusing to perform services, e.g., by permitting employees to refrain from working without suffering disciplinary action, in the event of a breach of the 'hot cargo' clause, the clause exceeds the prescribed bounds of the first proviso to Section 8(e) and is therefore unlawful."

The fact situation in this case presents three distinctive aspects:

(1) The clause sought by the union clearly extends a boycott as to nonunion standard employers beyond the jurisdiction of the contracting union to all job site subcontractors, whether involved in bricklaying or not.

(2) The clause provides internally for its own self-enforcement by permission for "member" strike action.

(3) Additionally, the stipulated facts show that with all other provisions agreed upon, the union sought to compel acceptance of this provision by official union strike action.

We do not believe that any case argued or cited to us presents just this set of facts. The clause here involved appears to be a carefully designed effort to secure a right for a bellwether craft union to refuse to work until guaranteed that there would be no nonunion-standard employers or employees in its craft or in any other craft or job on any job site on which its members were employed. This, of course, is the exact position which the building trades unions (and others) had taken traditionally throughout their history and up to the enactment of the Taft-Hartley Act in 1947. It is also the exact right which their subsequent 20 years of legislative efforts have not, to date, succeeded in restoring. This recital of history does not, of course, decide the legality of the instant clause and strategy. It simply defines the importance of this case and brings us to a point of beginning.

The basic prohibition upon secondary boycotts came into the Labor Management Relations Act in 1947 in the Taft-Hartley Amendments to the Act. A part of the language of that enactment was

Section 8(b) (4) (A) (now Section 8(b) (4) (B)):

"[F]orcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; * * *." 29 U.S.C. § 158 (b) (4) (B) (1964).

The relevance of this section to the traditional building trades' refusal to work on any job where there were nonunion employees was decided in N.L.R.B. v. Denver Building & Construction Trades Council, supra. This case was the subject of a vigorous dissent by Mr. Justice Douglas. It has been criticized as based on "inexperience,"[1] It has been the subject of repeated attempts to overrule it by legislative amendment.[2] The significant fact for this court is that whether wisely based or not, whether correctly interpreted or not, the *Denver Building & Construction Trades Council* case was the law in 1951, it has never been overruled, and Congress (as we shall see) definitely did not believe that it was changing it in its 1959 amendments to the act.

In the *Denver Building & Construction Trades Council* case the National Labor Relations Board found that, by engaging in a strike an object of which was to force the general contractor on a construction project to terminate its contract with a subcontractor employing nonunion labor on the project, the labor organization committed an unfair labor practice within the meaning of Sec. 8(b) (4) (A) of the National Labor Relations Act (now Sec. 8(b) (4) (B) ). The Supreme Court held that it was an object of the strike to force the contractor to terminate the contract of the electrical subcontractor; and that a strike with such an object is an unfair labor practice within the meaning of Sec. 8(b) (4) (A), even though that may not be the sole object. N.L.R.B. v. Denver Building & Construction Trades Council, supra.

It was not until the Supreme Court had interpreted Section 8(b) (4) (A) (the *Sand Door* case, supra) as not prohibitive of all secondary boycotts that Congress sought again to tighten the restrictions which it had already imposed. This led in 1959 to the adopting of Section 8(e). The body of Section 8 (e) provides as follows:

"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: * * *."

However, Congress saw fit in 1959 to add two provisos; one applicable to the construction industry, and one to the garment industry. Whatever the reasons therefor may be, the provisos were quite different in their nature:

"*Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site

---

1. See House Committee on Education and Labor, Situs Picketing, H.R.Rep. No. 1041, 89th Cong., 1st Sess. 4–7 (1965).

2. See 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 1434.

of the construction, alteration, painting, or repair of a building, structure, or other work: *Provided further*, That for the purposes of this subsection and subsection (b) (4) (B) of this section the terms 'any employer', 'any person engaged in commerce or an industry affecting commerce', and 'any person' when used in relation to the terms 'any other producer, processor, or manufacturer', 'any other employer', or 'any other person' shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further,* That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception."

In the congressional debate prior to the adoption of Section 8(e), the late President John F. Kennedy (then a United States Senator and the Chairman of the Senate Conference Committee on the Landrum-Griffin Bill) made it obvious that the congressional grant of an 8(b) (4) exception to the garment industry and the failure to grant a similiar exception in the construction industry was a deliberate legislative decision. Senator Kennedy explained:

"This proviso affects only Section 8 (e) and therefore leaves unaffected the law developed under Section 8(b) (4). * * * Since the proviso does not relate to Section 8(b) (4), strikes and picketing to enforce the contracts excepted by the proviso will continue to be illegal under Section 8(b) (4) whenever the *Sand Door* case * * * is applicable.

"It is not intended to change the law with respect to judicial enforcement of these contracts, or with respect to the legality of a strike to obtain such a contract." 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 1433.

Senator Kennedy then in reply to Senator Carroll of Colorado explained that the bill did not deal with the *Denver Building & Construction Trades Council* case, supra, but that he intended to do so in a separate bill after passage of the Landrum-Griffin measure.[3]

Since 1959 the NLRB has sought to follow what we may term the Kennedy interpretation.

■ Where a clause is lawful under Section 8(e), the Board allows strikes to obtain it, even though it commits the employer not to do business with nonunion standard employers. Northeastern Indiana Building Trades Council and Centlivre Village Apartments, 148 N.L.R.B. 854 (1964); Ets-Hokin Corp., 154 N.L.R.B. No. 52 (1965). On the other hand, the Board does not sanction strikes for clauses which contain provisions violative of § 8(b) (4) (B) if implemented. Los Angeles Building & Construction Trades Council, 153 N.L.R.B. 383 (1965). See also the Board's opinion in the instant case reported at 152 N.L.R.B. 360 (1965). But even if such a clause be lawfully achieved, the Board does not allow strikes or other private economic sanctions (as opposed to judicial intervention or arbitration) to enforce same. See Ets-Hokin Corp., 154 N.L.R.B. No. 52 (1965).

The D. C. Circuit in a well reasoned opinion by Judge J. Skelly Wright has followed this same set of interpretations:

"Secondary subcontracting clauses in the construction industry are lawful, under the *proviso* to Section 8(e), and economic force may be used to obtain them notwithstanding Section 8 (b) (4) (A), because Section 8(b) (4) (A) incorporates that *proviso* by ref-

---

**3.** The Congressional Record shows that immediately after the Senate vote on the Landrum-Griffin Bill, Senator Kennedy did introduce a bill, S. 2643, which would have had the effect of reversing the *Denver Building & Construction Trades Council* case. The bill, however, was never acted on by Congress. CCH 1959–60 Congressional Index.

erence. But under Section 8(b) (4) (B) such secondary clauses may be enforced only through lawsuits, and not through economic action. Primary subcontracting clauses, on the other hand, fall outside the ambit of Section 8(e), as the Board concedes. Moreover, economic enforcement thereof is not proscribed by Section 8(b) (4) (B) since it is not directed at involving neutral employers in a labor dispute 'not their own.' " Orange Belt District Council of Painters No. 48, AFL-CIO v. N.L.R.B., supra 328F.2d at 537, 538.

Respondent in this case relies heavily upon the opinion of Chief Judge Aldrich in N.L.R.B. v. Local 217, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the U. S. and Canada, AFL-CIO, supra. It seems clear to us, however, that the disputed clause in the collective bargaining agreement in the First Circuit case was quite different from the one we deal with. It provided that no member of the union "will be assigned to work or expected to work or required to work on any job or project on which a worker or person is performing any work within the jurisdiction of Local 217. * * * [at nonunion standards]."

The clause secured by the union in the First Circuit case was entirely an employer restriction, as opposed to the clause sought in the instant case where the right to enforce is sought for the members of the union.

In the First Circuit clause the duty was imposed upon the employer not to assign union members to work on any job or project on which a worker is performing work within the jurisdiction of Local 217 at nonunion standards. Such a clause is amenable to judicial enforcement. In the instant case the clause sought by the Bricklayers would provide that "the members of Bricklayers Local Union No. 5 may refuse to work on any job where any work, irrespective of craft, is performed * * * by craftsmen who enjoy less favorable wages and working conditions * * *." This in

our view contemplates strike action; albeit strike action sanctioned by the union in advance rather than at the moment of breach.

Although the First Circuit did not so interpret the matter, it also seems to us at least arguable that a strike to enforce this clause pertaining to the presence on the project of nonunion standard workers within the Plumbers Union's jurisdiction would have represented a primary dispute rather than a secondary one.

In the case currently before this court, however, it is clear that the members of the Bricklayers Union are permitted to leave their work in the event any employees of any subcontractor in any trade or job are employed on the project at nonunion standards.

Further still, the First Circuit decision pertaining to whether or not the clause there employed was in violation of the Sec. 8(e) clause was dictum which was related only to the language of the clause itself, without any concern for the surrounding facts. The First Circuit had already decided to enforce the NLRB's cease and desist order in that case on its finding that the strike was a secondary boycott in violation of Sec. 8 (b) (4) (B).

But in our present situation, we do not deal with the instant clause in a vacuum. It is being sought by vigorous union insistence in contract negotiation. Further, it was being sought (until a federal injunction was issued) by an officially sanctioned union strike. The strike was occasioned, after all other issues had been settled, solely by the refusal of the Greater Muskegon General Contractors Association to agree to the quoted clause. It would be hard for us to say that these facts would not constitute union "inducement" or "encouragement" of the members to employ the secondary boycott clause if it were in force.

■ We believe that this clause goes considerably beyond the provisions held by the First Circuit to be secondary in impact. This one trade union agreement,

if signed, would have the practical effect of a continuing strike threat to force the Greater Muskegon General Contractors Association to cease doing business with all nonunion standard contractors and subcontractors—not just in bricklaying, but in all trades. We agree with the NLRB that the clause is a secondary boycott clause, as Congress and the Supreme Court have employed that language to this date.[4]

Our last question is whether nonetheless the union may strike in order to force the Greater Muskegon General Contractors Association to sign this kind of self-help enforcement secondary boycott clause.

■ If there were no self-enforcement provision for member economic action, the *Sand Door* case, supra, would require an affirmative answer to this question. In that event a union in the construction industry could strike to get such a clause. See *Sand Door*, supra; Orange Belt District Council v. N. L. R. B., supra. It could enforce the clause in the courts. But it could not strike to enforce the clause if breached. Orange Belt District Council v. N. L. R. B., supra; N. L. R. B. v. International Brotherhood of Electrical Workers Local Union No. 683, AFL-CIO, 359 F.2d 385 (C.A.6, 1966).

■ But where, as here, the clause sanctions (and encourages) economic ac-

tion by members of respondent in the event the employer breaches the secondary boycott agreement, the clause looks, as the Board held, not to the courts but to strike action for enforcement. Such a clause is clearly illegal under the express language of Sec. 8(e), absent the proviso. But in addition, the self-help provision is an effort to authorize by contract, action which is made illegal by Sec. 8(b) (4) (B).[5] Such a clause would have been illegal before the 1959 Landrum-Griffin Bill. N. L. R. B. v. Denver Building & Construction Trades Council, supra. As we have seen, Congress did not see fit in the Sec. 8(e) proviso of that bill to exempt the construction industry from Sec. 8(b) (4) (B).

We believe that the union in insisting upon an illegal clause, and striking for same after all other issues were resolved, was guilty of refusing to bargain collectively with the employer in violation of Sec. 8(b) (3) as found by the NLRB. See N. L. R. B. v. Wooster Division of Borg-Warner, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1957).

We grant enforcement of the Board's order to the extent that it is founded on the Sec. 8(b) (3) violation.

We deem enforcement of the order as drafted (exclusive of Par. 1(a)) to be an adequate remedy. We therefore reserve the complex question of whether

---

4. By this holding we do not ignore the consistent arguments advanced by the building trades unions to the effect that all work on any single construction site is unitary in character. We simply accept the "primary" versus "secondary" distinction pertaining to the construction industry thus far employed by Congress and the United States Supreme Court. N.L.R.B. v. Denver Building & Construction Trades Council, supra.

5. "(b) It shall be an unfair labor practice for a labor organization or its agents—

 \* \* \* \* \*

 "(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his

employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

 \* \* \* \* \*

 "(B) forcing or requiring any person to cease using; selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, *or to cease doing business with any other person.* \* \* \* *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; \* \* \*." 29 U.S.C. § 158(b) (4) (B).

the building trade proviso nullifies the application of Sec. 8(e) for all purposes in the construction industry and hence excludes a finding of a Sec. 8(b) (4) (i) & (ii) (A) violation.

Enforcement of the National Labor Relation Board's order as modified is granted.