361 F.2d 160
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL 217, UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the U. S. AND CANADA, AFL-CIO, et al., Respondents.
 No. 6641.
 United States Court of Appeals First Circuit.
 Heard April 5, 1966.
 Decided May 25, 1966.
 
 William Wachter, Washington, D. C., Atty., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Glen M. Bendixsen, Washington, D. C. Atty., N. L. R. B., were on brief, for petitioner.
 Sidney W. Wernick, Portland, Me., with whom Theodore H. Kurtz and Berman, Berman, Wernick & Flaherty, Portland, Me., were on brief, for respondents.
 Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.
 OPINION OF THE COURT.
 ALDRICH, Chief Judge.
 
 
 1
 This is a petition to enforce an order of the National Labor Relations Board based upon alleged violations by respondent union, Local 217,[1] of sections 8(b) (4) (B) and 8(e) of the National Labor Relations Act, 29 U.S.C. § 158. The charging party, The Carvel Company, is a plumbing and heating contractor having a collective bargaining agreement with the union.[2] Kibler and Storer Company, hereinafter Kibler & Storer, is a general contractor engaged in building an addition to a bank building in Portland, Maine. Carvel is one of the subcontractors. Ballard Oil and Equipment Company, hereinafter Ballard, is a heating subcontractor on the project. Ballard is non-union, and its employees do not receive union wages.
 
 
 2
 Section X(4) of the collective bargaining agreement to which Carvel is a signatory provides that no member of the union "will be assigned to work or expected to work or required to work, on any job or project on which a worker or person is performing any work within the jurisdiction of Local 217 * * * [at non-union standards.]" Respondent pulled its men off the Kibler & Storer project because Ballard did not meet union standards. It concedes that this action was a strike,[3] and a boycott, and accepts the Board's interpretation that the fair meaning of section X(4) of the agreement is that Carvel should not only not ask its union employees to work on the project, but should itself "cease" to do so. The Board held respondent's action to be a secondary boycott in violation of section 8(b) (4) (B), and concluded that section X(4) of the contract violated section 8(e). One member dissented with respect to the latter.
 
 
 3
 Respondent's basic position is that the strike activity was primary because section X(4) requires Carvel to preserve "the labor standards for which he has contracted," and, alternatively, to protect "job opportunities." Respondent asserts that since the conduct required of Carvel by section X(4) is designed to protect the integrity of its own unit, the case falls within the rationale of those decisions upholding strike action to prevent an employer from subcontracting out work which could be done by its own employees,[4] and not within the proscription of NLRB v. Denver Building and Construction Trades Council, 1945, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284. Thus, it is argued, respondent's dispute is with Carvel, not with Kibler & Storer or Ballard, and for this reason section X(4) is not merely an attempt to immunize by contractual provision conduct that would otherwise be illegal. NLRB v. Bangor Bldg. Trades Council, 1 Cir., 1960, 278 F.2d 287.
 
 
 4
 We find no merit in respondent's argument that Ballard's employees jeopardize union standards by their presence "on the same construction project" because of their "immediate and proximate activity." No concrete example of jeopardy has been brought to our attention, and, on the facts of this case, we can conceive of no hazard to Carvel's employees. If any jeopardy existed, it was to Ballard, whose employees, by coming into contact with Carvel's might discover the advantages of union membership. Absent some express allegation we will not assume it to be respondent's position that Carvel's employees would be persuaded of any disadvantages.
 
 
 5
 Respondent, however, alternatively asserts that it was striking to preserve "job opportunities," because Ballard's "cheaper labor costs can be an inducement to the division of work." If respondent means to obtain more work for the union as a whole, as distinguished from Carvel's employees,[5] this would seem the clearest kind of a secondary boycott. But even if it be thought to mean more work for Carvel's employees alone, the Board could properly find that respondent's real dispute was not with Carvel. It is difficult to understand how, in the absence of the contractual agreement, see NLRB v. Bangor Bldg. Trades Council, supra, there existed any potential adversity between respondent and Carvel with respect to the division of labor. The union stands to suffer a loss of work only if Carvel itself suffers. This is a far cry from the subcontracting cases, supra, where the union's purpose was to prevent an employer from self-servingly taking away its employees' work to give it to another whose labor costs are lower. The union is striking not to protect itself from Carvel, but to reduce the possibility that another contractor, because of its lower labor costs, would obtain work that Carvel itself could bid on, and might otherwise get for itself.
 
 
 6
 Even if we were to assume that the strike was not secondary with respect to Carvel, the strike activity could well be found directed against Ballard, and designed to coerce Kibler & Storer, a neutral to the dispute, to cease doing business with Ballard. We do not accept respondent's asserted distinction that it was not seeking the "cessation of the business relationship between Kibler & Storer and Ballard," but was seeking simply that these parties comply with its wishes. This latter is the normal objective of any secondary boycott. In sum, we find unpersuasive respondent's contention that the Board was required to find that its strike constituted primary activity.
 
 
 7
 Respondent concedes that if the boycott is not primary, it has violated section 8(b) (4) (B). Determination that this was not primary activity also, concededly, disposes of respondent's contention that section X(4) of the agreement lies outside the ambit of section 8(e) of the act. We turn, therefore, to the question whether the agreement is saved from section 8(e) by the special construction industry proviso. The Board's decision that it is not seems to us based on a misconception.
 
 
 8
 Although section 8(e) generally prohibits "hot cargo" agreements, a proviso explicitly exempts "an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction * * *." This does not legalize an agreement which purports to authorize conduct in violation of section 8(b) (4) (B). Local 1976, United Brotherhood of Carpenters & Joiners of America, etc. v. NLRB (Sand Door), 1958, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186; NLRB v. Bangor Bldg. Trades Council, supra. It does authorize agreements if enforcement is limited to judicial remedies. Local Union No. 48 of Sheet Metal Workers, etc. v. Hardy Corp., 5 Cir., 1964, 332 F.2d 682. It is the Board's position that section X(4) is invalid because it "incorporates into the contract self-enforcement terms providing that employees may refuse to work."
 
 
 9
 In Muskegon Bricklayers Union, 1965, 152 N.L.R.B. No. 38, chiefly relied upon here, the Board said that exempted hot cargo clauses could not be enforced "by strikes or other self-help economic action proscribed by section 8(b) (4) (B)." This statement is correct. The difficulty is that section 8(b) (4) (B) does not prohibit all forms of economic self-help. This section makes it an unfair labor practice only "for a labor organization or its agents to engage in, or to induce or encourage any [employees] * * * to engage in, a strike or a refusal [to work] * * *." (Ital. ours.) A requisite to its application is that "employees must be induced." Sand Door, supra 357 U.S. at 98, 78 S.Ct. 1011. We think it implicit in the Court's opinion, see particularly pages 98-99, 78 S.Ct. 1011, that a totally self-generated cessation of work by Carvel's employees would not be proscribed.
 
 
 10
 The legislative history cited by the Board does not indicate the contrary. In the course of debate on the bill, Senator Kennedy explained,
 
 
 11
 "This proviso affects only Section 8(e) and therefore leaves unaffected the law developed under Section 8(b) (4). * * * Since the proviso does not relate to Section 8(b) (4), strikes and picketing to enforce the contracts excepted by the proviso will continue to be illegal under Section 8(b) (4) whenever the Sand Door case (357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186) is applicable.
 
 
 12
 "It is not intended to change the law with respect to judicial enforcement of these contracts, or with respect to the legality of a strike to obtain such a contract." 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 1433.
 
 
 13
 The House Managers' Report echoes this language:
 
 
 14
 "Picketing to enforce such contracts would be illegal under the Sand Door case * * *. To the extent that such agreements are legal today under section 8(b) (4) of the National Labor Relations Act, as amended, the proviso would prevent such legality from being affected by section 8(e). * * * The proviso is not intended to limit, change, or modify the present state of the law with respect to picketing at the site of a construction project. * * * It is not intended that the proviso change the existing law with respect to judicial enforcement of these contracts or with respect to the legality of a strike to obtain such a contract." 1 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 943-44.
 
 
 15
 The clear thrust of this history is that the construction industry proviso was intended to dovetail with section 8(b) (4), and neither to limit nor extend it. It is true that several cases decided subsequent to the 1959 amendments have broadly implied that no economic pressures of any kind could be used to enforce construction industry hot cargo clauses.[6] Local Union No. 48 of Sheet Metal Workers, etc. v. Hardy Corp., supra 332 F.2d at 686; Orange Belt District Council of Painters No. 48, etc. v. NLRB, supra 117 U.S.App.D.C. 233, 328 F.2d at 538. However, none of these cases involved the narrow distinction between union-induced and independent self-help.
 
 
 16
 It may be highly unlikely that employees in the position of Carvel's will refuse to work without having received some union suggestion to do so, but we must hold, so far as the abstract terms of the present contract are concerned, that as they do not call for section 8(b) (4) proscribed conduct, they remain within the construction industry proviso to section 8(e).[7]
 
 
 17
 A decree will be entered enforcing the order of the Board insofar as it relates to conduct found forbidden by section 8(b) (4) (B).
 
 
 
 Notes:
 
 
 [1]
 United Association of Journeymen and Apprentices of the Plumbing and Pipe-fitting Industry of the U.S. and Canada, AFL-CIO
 
 
 [2]
 Although the union frequently refers to the fact that this is a multi-employer agreement, we are satisfied that nothing turns on this
 
 
 [3]
 The stipulation recites that respondent "refused to allow Carvel's employees to work at the Casco Bank job." Respondent properly denominates the resulting cessation as "strike activities."
 
 
 [4]
 Orange Belt District Council of Painters No. 48, etc. v. NLRB, 1964, 117 U.S. App.D.C. 233, 328 F.2d 534; Truck Drivers Union Local No. 413, etc. v. NLRB, 1964, 118 U.S.App.D.C. 149, 334 F.2d 539, cert. den. 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186
 
 
 [5]
 "In realistic terms, the economic integrity ofa bargaining unit which includes the employees of * * * Carvel * * * is jeopardized * * * when the general contractor undertakes to divide the plumbing and steamfitting work between Carvel and another sub-contractor who provides cheaper labor." (Respondent's brief; ital. ours.)
 
 
 [6]
 This broader view finds some support in a statement by Senator Goldwater, 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 1858, relied upon by the Board inMuskegon, supra, and in its brief. Senator Goldwater's statement appears in a "memorandum" submitted to the Senate on September 14, 1959, contemporaneous with the President's signing of the bill. Since it was not before Congress when the bill was voted on, nor even, so far as is indicated, before the President when he signed the bill, we do not give it significant weight.
 
 
 [7]
 The Board did not indicate that merely by bargaining for inclusion of section X(4) in the labor contract the respondent union induced or encouraged a prohibited boycott, and we think such a position would be untenable. If the union could not bargain for a clause permitting independent employee action not prohibited by section 8(b) (4), such action would be a violation of the collective bargaining agreement, leaving the employees unprotected, and their right to take such actions largely illusory