Samuel M. KAYNARD, Regional Director of Region 29 of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 282, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Respondent.

No. 67–C–734.

United States District Court
E. D. New York.

Oct. 18, 1967.

Bruce H. Berry, Barry N. Steiner, Brooklyn, N. Y., for petitioner.

Cohen & Weiss, by Bruce H. Simon, New York City, for respondent.

Harry H. Rains, by Martin Scher, Mineola, N. Y., for charging party.

WEINSTEIN, District Judge.

The Regional Director of Region 29 of the National Labor Relations Board seeks a temporary injunction against a union pending final disposition of charges that it is engaging in unfair labor practices by means of a secondary boycott. 29 U.S.C. §§ 160(l), 158(b) (4) (i, ii) (B). Involved is an almost classic, if minor, instance of union reaction to a threat to the jobs of its members as a new technique is applied to an old field.

In Nassau County, clearing trees and brush by road-building contractors was accomplished by burning or hauling. Anti-pollution laws and a shortage of dumps led to the organization last year of the Harder Clearing and Maintenance Co., Inc., to dispose of trees on construction sites by "chipping." Harder's employees fell trees and feed them into a chipper. It cuts the wood into chips and blows them into a large van truck. The chips are hauled away to be sold for mulch or other uses. Harder planned rapid expansion of this service in the building and construction field.

Del Balso Construction Corporation has two substantial construction contracts in Nassau—one to build an expressway extension and the other to erect a railroad overpass over the extension. Tree removal for the overpass was done by Del Balso's employees using the traditional methods of clearing land. For the expressway, Del Balso subcontracted tree clearing to Harder.

Del Balso's drivers are members of Local 282 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America while the subcontractor's drivers are members of Local 1205 of the same international union. It is not disputed that Local 282's working conditions are superior to those of Local 1205.

Work has been going on for the overpass since August of 1966. It began on the expressway extension on June 26,

1967. On June 27, 1967, the day after Harder men began work, John Cody, a vice-president of Local 282, visited Del Balso's office at the construction site, spoke with Gerard Smith, the superintendent on the job, and informed him that the continued employment of Local 1205 workers to do Harder's trucking would result in a work stoppage. Anthony Del Balso, president of Del Balso, testified that upon learning of Cody's visit, he arranged a meeting with Cody for the next day to discuss the problem. At the meeting, Cody stated his position that Harder's use of "substandard" Local 1205 drivers on its trucks violated Del Balso's contract with Local 282.

Mr. Del Balso responded that although he did not want to get in the middle of what he "thought was sort of a—a jurisdictional scrap," he would try to work out an arrangement with Harder to put a Local 282 driver on Harder's truck, or to rent the equipment from Harder and put his own employees on the truck. Either arrangement was acceptable to Cody; if a substandard driver came on the job, however, Cody "told him we would shut down."

The next morning, on June 29, 1967, Charles Daglia, the Local 282 shop steward for Del Balso, ordered Local 282 drivers off Del Balso's job site. Upon being informed of the work stoppage, Local 282's drivers working for Colonial Sand and Gravel Company, Inc., J. D. Posillico, Inc., and Clearview Concrete Pipe Corp. ceased making deliveries of concrete and other supplies to the job site.

When Mr. Del Balso learned of the work stoppage, he spoke to Daglia who, Mr. Del Balso testified, stated "that he had been instructed by Mr. Cody to stop all trucks coming onto our job site if anybody from the Harder Company was working that morning." Cody testified that his instructions to Daglia were "to pull the job if a substandard operator comes on the job." Mr. Del Balso then told Daglia that "since there was no Harder truck on the site at the moment," it "was completely ridiculous" to stop work on the job.

Having received no satisfaction in his discussions with Daglia, Mr. Del Balso reached Cody by telephone, explained to him that the only Harder employees on the job were not truckdrivers and promised to work out an acceptable solution for the dispute. Cody then instructed Daglia to order the men back to work. This was done.

At 12:30 P.M., some two hours after the stoppage began, it was ended. No further difficulties over the tree clearing followed because Del Balso and Harder decided to "terminate their contract in view of the obvious union conflict going on."

Harder filed a charge with the N. L. R. B., alleging that Local 282 had "induced * * * individuals employed by Del Balso * * * to engage in a strike" in order "to force * * * Del Balso * * * to cease doing business with Harder." The N. L. R. B.'s Regional Director petitioned this Court for a preliminary injunction against Local 282 on the ground that there was reasonable cause to believe that Local 282 had engaged in an illegal secondary boycott. At a hearing before this Court, testimony was presented by the N. L. R. B. and Local 282.

Petitioner contends that the threats and work stoppage were designed to compel Del Balso to cease doing business with Harder and to force Colonial Sand & Gravel, Inc., J. D. Posillico, Inc., and Clearview Concrete Pipe Corp. to cease doing business with Del Balso. Strikes or threats with these objects are prohibited by Section 8(b) (4) (i, ii) (B) of the National Labor Relations Act which reads as follows:

Section 8. (b) It shall be an unfair labor practice for a labor organization or its agents * * *

(4) (i) to engage in, or to induce or encourage any individual employed by a person engaged in commerce or in an industry affecting commerce, to engage in, a strike or a refusal in the course of his employment to use, manu-

facture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any service; or (ii) to threaten, coerce or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is * * * (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, * * * *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

### Contract Between Del Balso and Local 282

Local 282's position is that its actions were primary activity not prohibited by Section 8(b) (4) (i, ii) (B) because they were intended to enforce valid work preservation clauses in its collective bargaining agreement with Del Balso. The clause on which the union places principal reliance provides:

Section 6. * * *. (c) The employer shall not hire outside trucks or equipment unless all his available suitable trucks and equipment are in use. Thereafter, the Employer shall hire only from others whose drivers receive wages, working conditions, benefits and standards of employment at least as favorable as those contained herein.

Because it is undisputed that Harder's drivers were not receiving wages and benefits "at least as favorable" as those received by members of Local 282, the union maintains that Del Balso violated the agreement and that the union applied economic pressure to force Del Balso to comply.

Petitioner denies that the equipment rental clause was applicable to the relationship between Del Balso and Harder. He contends that the relationship was governed not by section 6(c), but rather by section 6(l)—the subcontracting clause—which contains no provision for maintaining labor standards. It reads:

"Section 6. * * * (l) When specialized work is subcontracted to a recognized specialized subcontractor, *which is the only form of subcontracting permitted by this Agreement,* the said subcontractor must utilize its own equipment for such work to the extent substantially of the number of pieces of equipment owned by the subcontractor on July 1, 1966, and then the subcontractor must utilize available suitable equipment of the contractor before securing equipment from others or using any excess equipment secured by the subcontractor after July 1, 1966." (Emphasis in original.)

Petitioner therefore concludes that the union's alleged purpose of enforcing its contract with Del Balso is an afterthought and was not the real motive for Local 282's actions.

Local 282 maintains that "specialized work" within the meaning of section 6 (l) comprehends the recognized specialties in the industry—sewer, concrete foundation, and pipeline work—and not tree clearing. Since section 6(l) allowed "only [this] form of subcontracting," the union interprets the clause to prohibit subcontracting of the tree clearing work. In the union's view, the relationship between Harder and Del Balso was governed by Section 6(c), which was breached when Harder was allowed to use substandard drivers.

### Good Faith Attempt of Union to Enforce Del Balso Agreement

For purposes of this proceeding, it is unnecessary to decide which interpretation of the contract is correct. The union's submission—that the two clauses were designed to protect the standards won for its members against the threats posed by either subcontracting or the rental of equipment operated by substandard drivers—is reasonable.

The Court finds no support for petitioner's claim that the interpretation advanced by the union is so far-fetched as to give rise to the inference that it was a

mere fabrication used to camouflage other intentions. The Court finds that Local 282's interpretation was made and acted upon in good faith.

■ The record indicates that the union's purpose was to protect jobs traditionally performed by its members from encroachment by a subcontractor affording, from its vantage point, substandard working conditions. Before examining the legality of this objective, we will consider petitioner's contention that, regardless of any lawful purpose, the union also had the unlawful objective of bringing pressure on Harder by forcing Del Balso to cease doing business with it.

Petitioner has totally failed to establish this position. It offers no evidence of a dispute between Harder and Local 282. The fact that no Harder driver was on the job when the work stoppage was called does not, in the circumstances of this case, tend to prove that the union's intent was to injure Harder. Testimony concerning the work stoppage and the prompt resumption of work as soon as the circumstances were called to the attention of responsible union officials ιindicate that the strike at a time when no substandard driver was on the job resulted from a misunderstanding of instructions by the shop steward, Daglia.

The record supports the testimony of Mr. Del Balso—petitioner's main witness —that the union's "only interest was the fact there was a truck * * * on our job which was being driven by a man not a member of 282." This two-hour incident precipitated by a shop steward does not reflect a union policy to injure Harder.

### Lawfulness of Attempt to Enforce Union Agreement

Section 8(e) of the National Labor Relations Act (29 U.S.C. § 158(e)) makes it unlawful to enter into so-called "hot cargo" clauses—clauses in a collective bargaining agreement which require a neutral employer to cease doing business or handling goods of a primary employer. Probably because section 8(e) exempts job-site subcontracting clauses in the construction industry from its coverage, petitioner makes no claim that the clause relied upon by the union is illegal. The inquiry here is much the same as if the legality of the clause were in issue, however, because under section 8(b)(4)(i, ii)(B), economic pressure to enforce hot cargo clauses is illegal, even though, in the construction industry, entering into such clauses is not. Local 1976, United Bhd. of Carpenters, etc. v. N. L. R. B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958) (rule. before section 8(e) was enacted) ; N. L. R. B. v. Local 217, United Ass'n of Journeymen, 361 F.2d 160, 162–163 (1st Cir. 1966) (rule the same after section 8(e) enacted) ; Comment, 45 Cornell L.Q. 724, 751–52 (1960).

■■ The basic test for determining the legality of work and standards preservation clauses such as the union relies upon is the same as that for determining the legality of union action under section 8(b)(4)(i, ii)(B). The clause or activity is primary and lawful if "addressed to the labor relations of the employer vis-à-vis his own employees," but secondary and unlawful if only "tactically calculated to satisfy union objectives elsewhere." National Woodwork Mfrs. Ass'n v. N. L. R. B., 386 U.S. 612, 644–645, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357 (1967). Where a contract is designed to preserve "jobs fairly claimable by the bargaining unit," it is not unlawful under this test because it seeks to protect the work which is the very basis of relations between the union and the employer. Meat & Highway Drivers, etc. v. N. L. R. B., 118 U.S.App.D.C. 287, 335 F.2d 709, 713 (1964) ; Orange Belt District Council of Painters, etc. v. N. L. R. B., 117 U.S.App.D.C. 233, 328 F.2d 534, 538 (1964).

■ Under this rationale, the blanket prohibition on subcontracting is valid because it prevents Del Balso from giving work to other employers which had been done by Del Balso's employees. See Ohio Valley Carpenters Dist. Council (Cardinal Indus., Inc.), 136 N.L.R.B. 977, 984–86 (1962) ; Comment, 62 Mich.L.Rev. 1176, 1188 (1962). .Similarly, the re-

quirement that Del Balso utilize all its trucks before renting others is a valid work preservation clause. When trucks are leased, they are customarily driven by employees of the lessee. By preventing such leasing when Del Balso's trucks are available, the requirement protects the jobs which Del Balso's drivers have on these trucks.

The requirement that after Del Balso has exhausted its available equipment, it must then hire only trucks whose drivers receive benefits "at least as favorable" as members of Local 282, is only slightly more troublesome. It could be argued that because the union has already assured the jobs it can legitimately claim, it is seeking to satisfy wider objectives in this "union standards" clause. This very argument was considered and rejected in Truck Drivers and Helpers Union, etc. v. N. L. R. B., 118 U.S.App.D. C. 149, 334 F.2d 539, 548–549 (1964). In that case, the court pointed out that employment of equipment is not the only way in which the full utilization clause could be satisfied. The clause only requires the employer to use "suitable available equipment". Equipment might not be "suitable" because obsolescent; it might not be "available" because damaged. In either case, Del Balso employees would be out of work if equipment were rented rather than repaired or replaced. By removing the incentive to rent created by the possibly lower wage scales of the lessee's drivers, the requirement makes it much more likely that Del Balso will repair or replace rather than rent. Thus, this requirement also serves the primary objective of work preservation.

Moreover, the work standards clause might also be justified as designed to preserve work for members of Local 282 who are not employees of Del Balso. Although it has been said that clauses which preserve work "for union members generally" are prohibited, Meat & Highway Drivers, etc. v. N. L. R. B., 118 U.S. App.D.C. 287, 335 F.2d 709, 716 (1964), the circumstances of this case make that rule inapplicable. Del Balso's contract

with Local 282 was negotiated in industry-wide bargaining. By requiring each employer in the industry to hire only trucks whose drivers met union standards, Local 282 protected all its members from losing jobs to outsiders solely because outside drivers might work for less. Protection for all union members in a multi-employer bargaining unit by such a clause has been recognized as a lawful objective. Raymond O. Lewis (National Bituminous Coal Ass'n), 148 NLRB 249, 254–55 (1964), remanded, 122 U.S.App. D.C. 18, 350 F.2d 801 (1965); Lesnick, Job Security and Secondary Boycotts: The Reach of N.L.R.A. §§ 8(b) (4) and 8 (e), 113 U.Pa.L.Rev. 1000, 1027 (1965). Thus, on their face, the clauses relied upon by the union are valid work preservation clauses whose enforcement is legal under section 8(b)(4)(i, ii)(B).

The record indicates that Del Balso's employees had been doing tree clearing before Harder came into existence. Del Balso's men were actually clearing trees for the overpass on an adjacent work site. The union took defensive action to preserve jobs traditionally performed by Del Balso's employees. National Woodwork Mfrs. Ass'n v. N. L. R. B., 386 U.S. 612, 631, 87 S.Ct. 1250, 1269, 18 L.Ed.2d 357 (1967). Cf. N. L. R. B. v. Local 28, Sheet Metal Workers Int'l Ass'n, 380 F.2d 827 (2d Cir. 1967).

There is no proof of a pattern of behavior suggesting that Local 282's enforcement of otherwise valid provisions was designed to achieve unlawful objectives. Cf. Bakery Wagon Drivers, etc. v. N. L. R. B., 116 U.S.App.D.C. 87, 321 F.2d 353 (1963) (Enforcement of clause only against non-union employers indicated that objective was to unionize these employers). Should subsequent events indicate that the union has used the clauses as a weapon to force Harder or other non-Local 282 employers to employ its members, petitioner may apply for and obtain injunctive relief.

*Adverse Effect on Harder and Others of Activity Otherwise Lawful*

Petitioner also suggests that because acceptance of the union's demands would

result in termination of business between Harder and Del Balso, the union's activity was tainted with illegality. This argument is untenable.

 Section 8(b)(4)(i, ii)(B) is intended to outlaw secondary boycotts—action taken against a neutral employer with whom the union has no dispute, in order to bring pressure on the primary employer—but not primary strikes—action taken directly against the offending primary employer. National Woodwork Mfrs. Ass'n v. N. L. R. B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). Where the union's actions are taken in a primary dispute, they are not transformed into activities with an unlawful secondary objective however severe the impact on neutral employers. Id. at 627, 87 S.Ct. at 1259; Meat & Highway Drivers, etc. v. N. L. R. B., 118 U.S.App.D.C. 287, 335 F.2d 709, 713 (1964). Having failed to establish that the union had improper ulterior motives in enforcing its contract against Del Balso, petitioner cannot rely on the effect on Harder to establish an unlawful objective.

 Petitioner's assertion that Local 282 engaged in a secondary boycott by causing its members employed by Colonial Sand & Gravel, J. D. Posillico, and Clearview Concrete Pipe to cease making deliveries to Del Balso during the work stoppage also lacks merit. The union's conduct was typical and lawful primary picketing in support of a primary dispute. See Lesnick, The Gravamen of the Secondary Boycott, 62 Colum.L.Rev. 1363, 1396–98, 1415–16 (1962) (Turning truckdrivers away from plant of a struck employer is the classic case of primary picketing).

### Conclusion

On the evidence submitted, there is no reasonable cause to believe that Local 282 has engaged in any unfair labor practice. It affirmatively appears that its activities were primary and directed solely against Del Balso. 29 U.S.C. § 158(b)(4)(i, ii)(B). Though very slight, petitioner's burden of proof remains wholly unsatisfied.

A restraining order would not preserve the status quo. Rather, it would permit reduction of jobs held by Local 282 members and expanded use of chipping subcontracting during the period of at least a year while the N. L. R. B. considered the case.

Injunctive relief or a temporary restraining order is, on the record thus far established, neither proper nor just. 29 U.S.C. § 160(l). The petition is in all respects denied.

So ordered.