385 F.2d 551
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
NEW YORK LITHOGRAPHERS & PHOTO-ENGRAVERS UNION NO. ONE-P,
LITHOGRAPHERS& PHOTO-ENGRAVERS INTERNATIONAL
UNION, AFL-CIO, Respondent,
Alco-Gravure, Division of
Publication
Corporation,
Intervenor.
 No. 16382.
 United States Court of Appeals Third Circuit.
 Argued Oct. 2, 1967.
Decided Nov. 7, 1967.
 
 Thomas Canafax, N.L.R.B., Washington, D.C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Assistant Gen. Counsel, Gary Green, Atty., N.L.R.B., on the brief), for petitioner.
 Moss K. Schenck, Schenck & Schenck, New York City (Ann M. Schenck, New York City, on the brief), for respondent.
 John D. Canoni, Townley, Updike, Carter & Rodgers, New York City (Andrew L. Hughes, New York City, on the brief), for intervenor.
 Before STALEY, Chief Judge, and MARIS and VAN DUSEN, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Circuit Judge.
 
 
 1
 In this secondary boycott case, the National Labor Relations Board has found that New York Local One-P of the Lithographers & Photo-Engravers Union has threatened, coerced and restrained Alco,[1] an employer, and that 'an object' of the Union's conduct was 'forcing or requiring * * * (Alco) to cease doing business with * * * (another) person,' P.D.I.,[2] in violation of 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act, as amended by the Labor-Management Reporting and Disclosure Act of 1959. 29 U.S.C. 158(b)(4)(i) and (ii)(B). The Board asks us to enforce its order made pursuant to this finding. We are bound to do so if there is substantial evidence on the record as a whole to support the Board's conclusion.[3]
 
 
 2
 Alco is a rotogravure shop, printing newspaper supplements, commercial fliers, and catalogs. At its Hoboken plant, the location involved in this proceeding, respondent Local One-P represents approximately 158 photo-engravers and photographers and has bargained for them for over ten years. In its production of the final printed product, Alco uses the traditional camera method of producing negatives and positives: making a negative from original copy, correcting the negative for color, and then preparing a new positive, as the first steps toward etching the surface of the printing cylinder. For the past 20 years, Alco has lacked capacity to process by itself all the original copy and has accordingly subcontracted with outside suppliers for roughly 30% Of the initial processing needed to obtain either positives or negatives of the copy. This 30% Quantity of subcontracting has remained fairly constant over the past several years.
 
 
 3
 P.D.I., whose employees have also been represented by the respondent Local One-P for the past ten years, produces negatives and positives for use in the printing industry, not by the traditional camera method but by the newly developed process of electronic scanning. Their product is suited for use by the rotogravure shops and costs significantly less than positives and negatives produced by the old method.[4] Being electronic, the process also requires fewer employees (for P.D.I.) and turns out its product in a shorter time.
 
 
 4
 In the two years preceding the controversy in this case, the Union expressed increasing concern to P.D.I. about the impact of its electronic scanning process on job opportunities throughout the photo-engraving industry. In April 1964, the bargaining agreement with P.D.I. terminated and negotiations finally produced a new one-year retroactive contract in December 1964. Shortly before this new one-year contract expired at the end of April 1965, the Union served new proposals on P.D.I. in anticipation of the renewal of contract negotiations. Included in the list was a demand that P.D.I. stop making electronically-scanned positives. Two or three days before this demand, Local One-P, on orders from its International, initiated a sustained work stoppage at Alco over Alco's use of scanned positives purchased from P.D.I. Alco had first started to buy scanned positives from P.D.I. in June 1964, during the lengthy negotiations between P.D.I. and the Union that led to the one-year retroactive contract.[5]
 
 
 5
 In July 1964, an Alco employee objected to the scanned positives as violating the Union's contract, which prohibited the use of any new method without Union consent (Article IX, 9). Alco replied that it purchased the positives from an outside supplier, just as in the past, and no new process or machinery was being used. The president of Local One-P referred the matter to the Union's International organization after discussion with Alco, and the use of the P.D.I. positives continued until late October 1964 without renewed objection.
 
 
 6
 In October 1964 a 'refusal * * * to * * * handle' occurred when the Local ordered the photo-engravers not to work on the new positives on the ground that the 'new process' also jeopardized job security. When Alco asked for a preservation of the status quo pending a grievance meeting on this issue, the Local president replied that the subject of scanned positives 'was a matter of negotiations between P.D.I. and the International Union' and asked for a delay of the grievance meeting, since the problem would perhaps be resolved by those negotiations.
 
 
 7
 Alco continued again to use the scanned positives, but after an unexecuted threatened stoppage early in April 1965, Local One-P firmly refused to work on P.D.I. positives on April 20, 1965, pursuant to an order to all locals from the International. In attempting to resolve this refusal, the Local president again expressed hope that the negotiations between P.D.I. and the International would resolve the issue. Alco threatened to take legal action to stop the Union's refusal to handle the P.D.I. product; the Union replied that such legal action would provoke a strike.
 
 
 8
 On March 13, 1966, a majority of the Board[6] adopted the Trial Examiner's finding that 'an object' of the respondent's refusal to handle the scanned positives was to force Alco to stop buying this product from P.D.I. In a footnote to their decision, the Board emphasized that they placed 'primary reliance on, rather than viewing as merely supportive, the fact that Respondent's activities were for an object of safeguarding future employment opportunities for union members in general, rather than employees in the bargaining unit, as more fully set forth in a companion case issued this day.'
 
 
 9
 The question presented is whether the respondent's actions are protected by the proviso to 8(b)(4)(i) & (ii)(B), which excludes from proscription union activity described as 'primary.' /7/ Since virtually all union conduct traditionally regarded as primary (e.g., strikes over wages, working conditions, seniority, etc.) invariably contains 'secondary' effects, the distinction that Congress intended in 8(b)(4)(i) & (ii)(B) is difficult to apply in practice. Nonetheless, the statute compels the task. National Woodwork Manufacturers Ass'n v. N.L.R.B., 386 U.S. 612, 645, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). The conduct in question must be analyzed in terms of 'all the surrounding circumstances' (386 U.S. at 644, 87 S.Ct. 1250) to see whether it constitutes 'parallel primary activity' (two separate primary disputes), or 'primary activity with incidental effects,'[8] or the proscribed 'secondary activity.' Once the conduct has as 'an object' the prohibited secondary effect, it makes no difference that there are other objectives present, be they primary or otherwise. National Labor Relations Board v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 687-690, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).
 
 
 10
 The respondent's main contention is that the controversy in this case was solely one over job security; that the refusal to handle the P.D.I. positives and the partial work stoppage were primary actions in a dispute whose only object was Alco's subcontracting. In aid of this contention, they argued at length that the Board deviated from its own 'tests' of primary activity, such as the 'control over the subject matter of the dispute' test.[9] But such analysis to find primary activity is irrelevant as long as 'an object' is secondary' and substantial evidence exists on this record to support the Board's conclusion that respondent had the prohibited object regardless of other primary purposes.
 
 
 11
 The timing of the work stoppages at Alco, particularly the final refusal to handle coming contemporaneously with the new contract demands served on P.D.I. amply supports the conclusion that an object of the respondent was to force Alco to cease doing business with P.D.I. and thus gain additional pressure to force P.D.I. to stop making scanned positives-- a concern of the Union over employment which extended far beyond the threatened purchaser, Alco.[10] The inference drawn from the respondent's timing received further support from the statements of the officers and shop stewards involved, who made it clear that any Alco primary dispute was viewed by them as 'tactically calculated to satisfy union objectives elsewhere',[11] that is, hopefully to be settled by the negotiations with P.D.I.-- the locus of another 'object' of the respondent's activity.
 
 
 12
 It is clear on the record that, after P.D.I. positives became available, Alco had not increased its total subcontracting and that Local One-P objected solely to the subcontracting for P.D.I. scanned positives. The positives of all other subcontractors, as well as negatives from all producers, were not objected to by anyone. Therefore, even assuming that another object of the respondent was future job security (by forcing Alco's strict allegiance to clauses in the Union's contract possibly relating to subcontracting), the Union's actions had a decidedly pointed focus on a single product of a single subcontractor. It is well settled that the existence of a valid clause limiting ability to contract is not a defense to union activity to enforce that clause which violates 8(b) (4). Local 1976, United Brotherhood of Carpenters' and Joiners of America v. National Labor Relations Board, 357 U.S. 93, 106, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958); N.L.R.B. v. Local 825, Internat'l U. of Operating Engineers, 326 F.2d 213, 218 (3rd Cir. 1964). In the distinctive factual setting of this case, therefore, the peculiar form the respondent's activities took, that of action directed at a single product of a single supplier, gives still further grounds for finding that 'an object' of their protest at that time was clearly secondary. The allegations of concern over subcontracting or job security provide no defense. Our enforcing the Board's order in this case in no way prevents arbitration or other recourse by the Union if it continues to feel that Alco's interpretation of certain clauses in the contract is in error.[12]
 
 
 13
 We agree with the Board that, at the time the respondent induced and encouraged employees of Alco to strike and refuse to handle electronically scanned positives purchased from P.D.I., they had a secondary objective prohibited by 8(b)(4)(i) & (ii)(B) of the Act. This finding of the Trial Examiner, adopted by the Board, was well supported by the evidence in this record as a whole.
 
 
 14
 The order of the Board will be inforced.
 
 
 
 [1]
 Alco Gravure, Division of Publication Corporation, intervenor in this enforcement petition
 
 
 [2]
 Printing Developments, Inc
 
 
 [3]
 Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 490-491, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The Board decision adopting the Trial Examiner's findings and order of September 22, 1966, are printed at 160 N.L.R.B. No. 91
 
 
 [4]
 There was some evidence that with the present perfection of the electronic process, electronically produced positives require more touch-up and corrective work than positives from other subcontractors produced by the traditional 'camera' method. The increased labor costs to Alco on such scanned positives is presumably more than offset by the 'at least 50%' reduction in cost of the electronically scanned positives from P.D.I
 
 
 [5]
 Alco apparently purchased scanned negatives from P.D.I. for four or five years before the work stoppage of April 1965
 
 
 [6]
 This case was accompanied by a closely similar dispute arising at Alco's Baltimore shop. In a decision and order printed at 160 N.L.R.B. No. 90, the Board upheld the Trial Examiner's finding that Local 2-P had violated 8(b) (4)(i) & (ii)(B), but reversed his conclusion, that the International had not committed the same violation by its actions. The Baltimore case differed from the Hoboken dispute in several details of timing, Union objection to the scanned positives, and the fact that about the time of the dispute Alco had a substantial increase in subcontracting from its Baltimore plant. Two members of the Board dissented with opinion and subsequently extended their dissent to this case for the same reasons. Respondent urged us to consider the fact of these dissents in determining whether the Board's decison was supported by substantial evidence. But the presence of a dissent, as opposed to a 5-0 vote, has no significant effect on the court on this record. It could mean that the majority gave even more consideration to the evidence than usual, just as easily as it could show evidence of doubtful weight
 
 
 [7]
 29 U.S.C. 158(b) states:
 'It shall be an unfair labor practice for a labor organization or its agents--
 '(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--
 '(B) forcing or requiring any person to cease using, selling, handling, trnasporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, * * * Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; * * *'
 
 
 [8]
 E.g., Local 761, International Union of Electrical, Radio and Machine Workers, etc. v. National Labor Relations Board, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961)
 
 
 [9]
 E.G., United Assn. Pipe Fitters Local 455, Etc., 154 N.L.R.B. 285 (1965). Other tests suggested included the 'work normally performed' test, international Longshoremen's Etc., 137 N.L.R.B. 119 (1962); the 'employer looked to' test, Local 1066, Int'l. Longshoremen's Ass'n., Etc., 137 N.L.R.B. 45 (1962)
 
 
 [10]
 Alco could be lawfully subjected to pressures designed to protect the interests of its own employees, but not to protect interests of all photo-engravers and photographers throughout the industry. National Woodwork Manufacturers Ass'n v. N.L.R.B., 386 U.S. 612, 645, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); United Mine Workers of America v. Pennington, 381 U.S. 657, 666, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); N.L.R.B. v. Local 217, United Ass'n. of Journeymen & App., 361 F.2d 160, 162 (1st Cir. 1966). Cf. the footnote to the Board's decision referred to above at p. 554. The shop steward's own letter concerning the final refusal to handle pointed out that they were acting pursuant to an order from the International
 
 
 [11]
 National Woodwork Manufacturers Ass'n v. N.L.R.B., supra, 386 U.S. at 644-645, 87 S.Ct. at 1268
 
 
 [12]
 The respondent urged us to defer to the arbitration process to resolve the controversy. But the presence of arbitration proceedings should be no more a defense to illegal conduct than the presence of a valid subcontracting clause. The Union claims that Alco has violated Article II, 4 (substitute equipment or work-processes; union acceptance of past subcontracting), and Article VIII, 9 (union consent needed for new process or machinery) of their 'Agreement' for 1964-1965