John F. LEBUS, Regional Director of the Fifteenth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner

v.

LOCAL 60, UNITED ASSOCIATION OF JOURNEYMEN & APPRENTICES OF THE PLUMBING AND PIPE FITTING INDUSTRY OF THE UNITED STATES AND CANADA, AFL-CIO, Respondent.

Civ. A. No. 10980.

United States District Court
E. D. Louisiana,
New Orleans Division.

April 14, 1961.

Marvin Roth, Washington, D. C., for petitioner.

Dodd, Hirsch, Barker & Meunier, C. Paul Barker, Thomas J. Meunier, New Orleans, La., for respondent.

WRIGHT, District Judge.

Invoking Section 10(*l*) of the Taft-Hartley Act, 29 U.S.C.A. § 160(*l*), and alleging that there is reasonable cause to believe that the respondent Union is guilty of unfair labor practices toward Binnings Construction Company, the general contractor for the construction of a sewage disposal plant at Norco, Louisiana, the NLRB seeks a temporary injunction to restrain picketing of the job site pending a final disposition of the complaint filed before the Board.

The immediate cause of the dispute is apparently Binnings' decision to have two of his own pipe fitter employees, members of the respondent Union, install cast iron pipes and pumps rather than let out the work to a plumbing subcontractor, as the Union would prefer. Though respondent insists that it does not care whether a union or non-union subcontractor is chosen and that the question whether the work is performed by plumbers or pipe fitters is subsidiary, the NLRB charges that the Union's activity is designed to force Binnings to enter into a prohibited "hot cargo" agreement in violation of § 8(b) (4) (A) of the Taft-Hartley Act, and compel him to assign work to one "trade, craft, or class" rather than another, in violation of § 8(b) (4) (D) of the Act. 29 U.S.C.A. § 158(b) (4) (A) and (D).

*The § 8(b) (4) (A) charge.*

The first charge is particularly difficult to understand. Indeed, there is no showing whatever that the Union has ever demanded from Binnings an agreement whereby the contractor would ob-

ligate himself to use only union subcontractors. The Union expressly denies any such intent and it cannot be inferred from the circumstances. On the contrary, whatever may have been its original motive, before this proceeding was initiated the Union had publicly stated its willingness to accept a non-union subcontractor for the disputed work.[1]

But, even if this was one of the objects of its activity, there is no violation of the Taft-Hartley Act involved. For, as already noted in LeBus v. International Union of Operating Engineers, etc., D.C.E.D.La., 188 F.Supp. 392, 396, note 5, § 8(b) (4) (A) only condemns coercive action "forcing or requiring any employer * * * to enter into any agreement *which is prohibited* by subsection (e) of this section," and the cited subsection expressly exempts from the general ban on so-called "hot cargo" clauses "an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work." 29 U.S. C.A. §§ 158(b) (4) (A) and 158(e). There is no merit in the NLRB's argument that the quoted proviso of subsection (e) merely sanctions *voluntarily entering into* a "hot cargo" agreement in the construction industry but does not lift the ban on coercive measures designed to *force* such a stipulation from an employer. Whatever the wisdom of the policy, the clear text of § 8(b) (4) (A) denies the union its traditional weapons only when it would use them to secure an *illegal* agreement, and neither § 8(e), which "shall not apply" to such an agreement, nor any other provision, condemns the so-called "subcontractor clause" in bargaining contracts. As the NLRB itself emphasizes, the Conference Report with regard to the proviso to § 8(e) dealing with such agreements says it was "not intended * * * [to] change the existing law with respect to judicial enforcement of these contracts or *with respect to the legality of a strike to obtain such a contract*,"[2] and, while either implication might be read in this language, the fact is that striking to obtain a subcontractor agreement was not illegal when the Taft-Hartley Act was amended in 1959. Local 1976, United Brotherhood of Carpenters, etc. v. National Labor Relations Board (Sand Door), 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186, had merely held that such an agreement could not be "enforced" through a prohibited secondary boycott,[3] but it did not condemn other lawful activity directed to persuading the employer to enter into that type of stipulation.[4] Nothing in the original

---

1. Originally, the Union picketed the construction site with signs reading:

   "No plumber sub contractor in agreement with Local 60 employed on this job by Binnings Construction Co. No grievance with any other contractors on this job."

   However, on March 23, 1961, a week after these charges were filed with the NLRB, but five days before application was made to the court, the Union changed its signs, and so advised the Board's Regional Director, to read as follows:

   "No plumbing subcontractor is employed on this job by Binnings Construction Co. We have no grievance with any other contractor on this job."

2. H.R.Rep. No. 1147, 86th Cong., 1st Sess., pp. 39–40, in 1 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, pp. 943–944; 2 U.S.Code Congressional and Administrative News 1959, pp. 2318, 2512.

3. See also LeBus v. International Union of Operating Engineers, etc., supra. Here, no secondary boycott is charged. Accordingly, § 8(b) (4) (B) of the Taft-Hartley Act, 29 U.S.C.A. § 158(b) (4) (B), and the Sand Door ruling, are not relevant.

4. The Sand Door opinion intimates no view on the question presented here. It also left open the question whether a "hot cargo" agreement, once entered into, could be enforced by means other than the secondary boycott: "It does not necessarily follow from the fact that the unions cannot invoke the contractual provision in the manner in which they sought to do so in the present cases that it may not, in some totally different context

Taft-Hartley law, or in its legislative history, indicates an intent to ban such activity and there is no ground for holding that conduct illegal. It follows that the charge under § 8(b) (4) (A) is without merit.

### The § 8(b) (4) (D) charge.

As already noted, the second charge filed by the NLRB accuses the respondent Union of attempting to force Binnings to assign the work of installing certain pipes and pumps to plumbers rather than pipe fitters, in violation of § 8(b) (4) (D) of the Taft-Hartley Act. At the outset, there is serious doubt whether that is really the bone of contention. The Union maintains that its quarrel with the employer is not over assignment of the work to plumbers or pipe fitters, but arises out of Binnings' attempt to install the pipes himself with his own employees rather than subcontract the job to a qualified plumbing concern, which it says is approved industry practice. The question whether plumbers or pipe fitters will actually perform the work is, according to the Union, not in dispute, and, if it were, that issue could be settled internally since both crafts belong to the same labor organization. Moreover, even if the NLRB's appraisal of the dispute is correct, it may be doubted whether § 8(b) (4) (D) was ever meant to apply when the argument over assignment involved only workers of a single union. Indeed, though plumbers and pipe fitters presumably belong to separate "trades" or "crafts" within a literal reading of subsection (D), it is difficult to see in the sort of intramural argument here alleged the evils of the traditional "jurisdictional dispute" which Congress had in mind.

■ But it is unnecessary to rest decision on a resolution of these doubts.

There is a more fundamental objection to the present proceeding which stems from the Supreme Court's recent ruling in National Labor Relations Board v. Radio and Television Broadcast Engineers, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed. 2d 302. The Court there held that when a § 8(b) (4) (D) complaint is presented the Board should institute a § 10(k) [5] proceeding and make a final adjudication as to the proper assignment of the work in question rather than proceed under § 10(c).[6] The Taft-Hartley Act was found to prefer a permanent settlement of the dispute over a mere allocation of blame. Jurisdictional disputes justify an unfair labor practice investigation only after the Board has determined which craft shall perform the work.

It is true that § 10(l), here invoked, specifically authorizes a temporary injunction in jurisdictional dispute cases, but, significantly, that provision is separately stated at the end of the section and is specially restricted to "situations where such relief is appropriate." The Radio and Television Broadcast Engineers decision gives the caveat its full meaning. In the proper case, the court may lend its arm to preserve the status quo during the pendency of a proceeding under § 10(k), but, until a final assignment is made by the Board, there can be no proper occasion to issue an injunction in aid of a proceeding under § 10(c).

Thus, here, since no § 10(k) proceeding has been initiated, the request for a temporary injunction pending a determination of the unfair labor practice charge under § 10(c) is, at best, premature. The NLRB is not following the mandate of the statute and this court cannot become party to a procedure expressly condemned by the Supreme Court.

Injunction denied.

not now before the Court, still have legal radiations affecting the relations between the parties." Local 1976, United Brotherhood of Carpenters, etc. v. Na-

tional Labor Relations Board, supra, 357 U.S. 108, 78 S.Ct. 1020.

5. 29 U.S.C.A. § 160(k).

6. 29 U.S.C.A. § 160(c).