**ORANGE BELT DISTRICT COUNCIL OF PAINTERS NO. 48, AFL–CIO, et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 17388.**

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 6, 1963.

Decided Jan. 30, 1964.

🔑344

Mr. Herbert M. Ansell, Washington, D. C., of the bar of the Supreme Court of California, *pro hac vice,* by special leave of court, for petitioners. Mr. Herbert S. Thatcher, Washington, D. C., was on the brief for petitioners. Mr. David Barr, Washington, D. C., also entered an appearance for petitioners.

Mr. Hans J. Lehmann, Atty., National Labor Relations Board, with whom Messrs. Stuart Rothman, Gen. Counsel, National Labor Relations Board, at the time the brief was filed, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, Atty., National Labor Relations Board, were on the brief, for respondent.

Before BAZELON, Chief Judge, and BURGER and WRIGHT, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

The central issue before us for decision is whether the unions here violated Section 8(b) (4) (ii) (B) of the

Labor Act [1] by making threats [2] against a general contractor in the construction industry to enforce his union agreement concerning subcontracting. The Board found that the action threatened here was secondary and within the proscription of Section 8(b) (4) (ii) (B). On this record, we are unable to accept the basis given by the Board for its conclusion, and so remand.

## I.

The agreement between the unions and the general contractor here apparently contained two subcontractor clauses, neither of which is in the record: [3] Paragraph Four presumably limited subcontracting to firms which had signed union contracts, Paragraph Five made the general contractor financially responsible for certain fringe benefits if his subcontractor did not pay them "as provided under the appropriate [union] agreement." [4] In October, 1961, the union sent the general contractor a letter stating he had violated both Paragraphs Four and Five by subcontracting to a firm which had neither signed a union contract nor paid the required fringe benefits.[5] To redress the violation of Paragraph Four's union-signatory clause, the letter threatened a lawsuit. For violation of Para-

---

1. 73 Stat. 525, 542, 29 U.S.C. § 158:
   "Unfair labor practices
   \* \* \* \* \* \* \*
   "(b) It shall be an unfair labor practice for a labor organization or its agents—
   \* \* \* \* \* \* \*
   "(4) \* \* \* (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
   \* \* \* \* \* \* \*
   "(B) forcing or requiring any person to cease \* \* \* doing business with any other person, \* \* \* *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;" (U.S.C. Supp. IV, 1959–62.)

2. Under § 8(b) (4) (ii) of the Act, threats made to neutral employers of "labor trouble and other consequences" are equated with the actual carrying out of the threats by means of a "strike or other economic retaliation". 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 at 1523 (1), 1568(2), 1581(1), 1750(1) (1959). Los Angeles Mailers Union No. 9, Intern. Typo. Union v. N. L. R. B., 114 U.S.App. D.C. 72, 74, 311 F.2d 121, 123 (1962).
   As the Board concedes, "threats of economic sanction against a primary employer, like actual strikes and picketing so directed, do not transgress Section 8(b) (4) (B)." Of course, as the Trial Examiner held below, "threats" or warnings of a lawsuit are equally as permissible as the actual bringing of legal action to enforce a union demand.

3. See Note 5, infra.

4. The record does not show either to whom or how these fringe benefits would be paid. This might be relevant to determining the true purpose of requiring the payments.

5. The bargaining agreement itself is, for some reason, not in the record. Our knowledge of the content of Paragraphs Four and Five is therefore based solely on the letter, which reads as follows:
   "We wish to call your attention to certain provisions of the collective bargaining agreement which you appear to be violating at this time.
   "There are two separate independent provisions of the contract that you are violating. Paragraph 4 provides that if you subcontract any work, it shall be to a sub-contractor signatory to an executed current agreement with a union affiliated with the Council. We are informed that you have subcontracted certain work to Calhoun Dry Wall, who is not signatory to such a collective bargaining agreement. We put you on notice that unless this breach of the agreement is rectified within twenty-four (24) hours, we shall turn this matter over to our attorneys to file suit against you.
   "Paragraph 5 of the agreement provides that in the event you subcontract any work and the sub-contractor fails to pay fringe benefits provided under the appropriate agreement with the union affiliated with the Council, that you become personally liable for such sums and such sums become due and payable by you immediately.
   "We are informed that you have subcontracted certain work to Calhoun Dry Wall. This work properly falls within the jurisdiction of the painters union which is affiliated with this Council. Under the standard agreement presently in effect between painters union and the

graph Five's fringe-benefits provision, the letter threatened economic coercion in the form of picketing.

After hearing on an unfair labor practices complaint, the Trial Examiner found that Paragraph Four had been legally enforced solely through the threat of lawsuit, and that Paragraph Five was "a legally unencumbered lawful provision," so that both that clause itself and picketing to enforce it were primary activity, outside the prohibitions of Section 8(e), even without the *proviso*, and outside Section 8(b) (4) (ii) (B). No mention of a relation between Paragraphs Four and Five was made.

The Board, in overruling its Trial Examiner, held that Paragraph Five was a penalty clause for Paragraph Four, and that the use of threats of picketing to enforce Paragraph Five was intended indirectly to enforce Paragraph Four. It held that this indirect economic enforcement of Paragraph Four had as its ob-

ject the cessation of business between the general contractor and his non-union subcontractor, thus violating Section 8 (b) (4) (ii) (B). The Board chose to rely on this reasoning rather than adopt the General Counsel's contention that economic enforcement of Paragraph Five standing alone was sufficient to violate Section 8(b) (4) (ii) (B). Thus the Board apparently disagreed with both its Trial Examiner and its General Counsel.

## II.

Secondary subcontracting clauses in the construction industry are lawful, under the *proviso* to Section 8(e),[6] and economic force may be used to obtain them notwithstanding Section 8 (b) (4) (A),[7] because Section 8(b) (4) (A) incorporates that *proviso* by reference.[8] But under Section 8(b) (4) (B) such secondary clauses may be enforced only through lawsuits, and not through economic action.[9] Primary subcontract-

industry, the following fringe benefits are due and payable:
"Health and welfare ....14¢ per hour.
Contract administration 2¢ per hour.
Vacation ............10¢ per hour.
"Your sub-contractor has failed to make these payments and unless you make the payments within twenty-four (24) hours, we shall take all necessary action, including peaceful picketing, to compel compliance with paragraph 5 of the agreement."

6. Section 8(e) bans not just explicit "hot cargo" clauses, but all clauses sanctioning in advance a secondary boycott, Los Angeles Mailers Union No. 9, Intern. Typo. Union v. N. L. R. B., supra Note 2; District No. 9, International Ass'n of Machinists v. N. L. R. B., 114 U.S.App.D.C. 287, 315 F.2d 33 (1962), but there is an explicit exception for subcontracting clauses in this industry:
"(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such

an agreement shall be to such extent unenforcible and void: *Provided*, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: * * *."

7. 29 U.S.C. § 158(b) (4) (A):
"forcing or requiring any employer or self-employed person to * * * enter into any agreement which is prohibited by subsection (e) of this section;"

8. Construction, Production & Maintenance Laborers Union, Local 383 v. N. L. R. B., 9 Cir., 323 F.2d 422 (1963); LeBus, etc. v. Local 60, United Association of Journeymen, E.D.La., 193 F.Supp. 392, 392–393 (1961); Kennedy, etc. v. Construction, Production & Maintenance Laborers' Union, D.Ariz., 199 F.Supp. 775, 778–779 (1961); Cuneo v. Essex County & Vicinity Dist. Coun. of Carpenters, etc., D.N.J., 207 F.Supp. 932, 938–939, 941–944 (1962). See also 2 LEGISLATIVE HISTORY OF THE LABOR-MANAGEMENT REPORTING AND DISCLOSURE ACT OF 1959 at 1433(3).

9. Local 1976, United Broth. of Carpenters and Joiners of America Union v. National Labor Relations Board (Sand Door case),

ing clauses, on the other hand, fall outside the ambit of Section 8(e),[10] as the Board concedes. Moreover, economic enforcement thereof is not proscribed by Section 8(b)(4)(B) since it is not directed at involving neutral employers in a labor dispute "not their own."[11]

The key question presented by subcontracting clauses in union agreements with general contractors is whether they are addressed to the labor relations of the subcontractor, rather than the general contractor.[12] If, so, they are secondary as to the general contractor and may not be enforced against him through economic weapons. Thus, any attempt to enforce, by economic means, a subcontracting clause which blacklists all non-union subcontractors would violate Section 8(b)(4)(ii)(B).[13] But not all subcontracting clauses are so designed. The test as to the "primary" nature of a subcontractor clause in an agreement with a general contractor has been phrased by scholars as whether it "will directly benefit employees covered thereby,"[14] and "seeks to protect the wages and job opportunities of the employees covered by the contract."[15] We have phrased the test as whether the clauses are "germane to the economic integrity of the principal work unit,"[16] and seek "to protect and preserve the work and standards [the union] has bargained for,"[17] or instead "extend beyond the [contracting] employer and are aimed really at the union's difference with another employer."[18] As we said in *Retail Clerks*, the Board may not rely on

"blanket pronouncements in respect to subcontracting clauses. These clauses take many forms. Some prohibit subcontracting under any circumstances; some prohibit it unless there is sufficient work in the shop to keep shop employees busy; some prohibit it except where the subcontractor maintains a wage

357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958); N. L. R. B. v. Bangor Building Trades Council, AFL–CIO, 1 Cir., 278 F.2d 287, 290 (1960); LeBus, etc. v. International Union of Operating Engineers, etc., E.D.La., 188 F.Supp. 392, 394–395 (1960); 1 LEGISLATIVE HISTORY OF THE LABOR-MANAGEMENT REPORTING AND DISCLOSURE ACT OF 1959 at 943–944; 2 id. 1433(3).

10. "A restriction upon subcontracting which seeks to protect the wages and job opportunities of the employees covered by the contract, by forbidding the employer from having certain kinds of business done outside his own shop, is quite different in purpose and effect from blacklisting specified employers or groups of employers because their products or labor policies are objectionable to the union." Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 MINN.L.REV. 257, 273 (1959).

11. National Labor Relations Board v. Denver Bldg. & Const. Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951).

12. In its brief in the companion case, the Board raises the hypothesis of a subcontracting clause relating to a trade where the general contractor has no employees. But in this case, as the Board admitted in that one. "the record contains no evidence as to the number of [the general contractor's] employees, if any, nor as to their craft or trade."

13. *District No. 9, International Ass'n of Machinists v. N. L. R. B.*, supra Note 6; Retail Clerks Union Local 770, etc. v. N. L. R. B., 111 U.S.App.D.C. 246, 296 F.2d 368 (1961).

14. Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 HARV. L.REV. 1086, 1119 (1960).

15. See Note 10, *supra.*

16. District No. 9, International Ass'n of Machinists v. N. L. R. B., supra Note 6, 114 U.S.App.D.C. at 290, 315 F.2d at 36. We there condemned a provision as not within "the area of a legitimate union claim designed to limit the work to employers maintaining labor standards commensurate with those required by the Union * * * *" but rather constituting "concurrence between the union and [the contracting employer] to boycott another employer for reasons not strictly germane to the economic integrity of the principal work unit." *Ibid.*

17. Retail Clerks Union Local 770, etc. v. N. L. R. B., supra Note 13, 111 U.S.App. D.C. at 252, 296 F.2d at 374.

18. Local 636, United Association, etc. v. N. L. R. B., 108 U.S.App.D.C. 24, 30, 278 F. 2d 858, 864 (1960).

scale and working conditions commensurate with those of the employer who is party to the collective agreement. On the face of it, these provisions would seem to be legitimate attempts by the union to protect and preserve the work and standards it has bargained for. In the latter supposition, for example, the union may be attempting to remove the economic incentive for contracting out, and thus to preserve the work for the contracting employees." [19]

Similarly, in discussing union-standards subcontracting clauses *in District No. 9, International Ass'n of Machinists v. N. L. R. B., supra* Note 6, we indicated that "to limit the work to employers maintaining labor standards commensurate with those required by the Union" was within "the area of a legitimate union claim." [20] It is not clear that the Board endorses these principles,[21] but we have been shown no reason to gainsay them.

### III.

With this background, we may turn to the clauses here involved. Unfortunately, for reasons not disclosed, the text of these clauses is not in the record. Consequently, neither the Board nor this court is in a position to determine precisely what they mean. The union freely admits that Paragraph Four is a union-signatory clause, lawful only because of the *proviso* to Section 8(e) and unenforceable by economic means. But it points out that its threat of economic action was carefully limited to violations of Paragraph Five, which it claims is a union-standards clause limited to fringe benefits and as such is pri-

mary to the general contractor and enforceable against him through economic means.

The union's interpretation of Paragraph Five seems to have been accepted by the Trial Examiner. The General Counsel's contention before the Board was that Paragraph Five, standing alone, is secondary and therefore unenforceable through economic means because it in effect requires at least partial recognition of petitioner unions by any subcontractors with whom the general contractor might deal. The Board, overruling its Trial Examiner and explicitly refusing to rely on the grounds advanced by its General Counsel, held that the Paragraph Five fringe-benefits guarantee was a penalty for doing business with a non-union subcontractor in violation of Paragraph Four. The Board's only discussion of this point follows:

"It is * * * apparent that a contractor who failed to comply with Paragraph 4—admittedly a 'hot cargo' provision—would be required to make the payments called for under Paragraph 5, regardless of the conditions of employment applicable to the subcontractor's employees. Paragraph 5 is thus, in effect, a penalty imposed on the contractor for failure to comply with the provisions of Paragraph 4."

Because the text of the clauses is not before us, we are unable to appraise the relative merits of the various positions taken by the union, the Trial Examiner, the General Counsel, and the Board. Under the circumstances, we shall vacate the Board's order and remand this matter so that the record may be supplemented with the text and details of Para-

19. Retail Clerks Union Local 770, etc., v. N. L. R. B., supra Note 13, 111 U.S.App. D.C. at 251–252, 296 F.2d at 373–374.

20. See Note 16, *supra.*

21. The Board argues, in the companion case, that we adopt the following test: "A subcontractor clause is clearly secondary which limits not the fact of subcontracting—either prohibiting it

outright or conditioning it upon, e.g., current full employment of the signatory employer's employees—but the persons with whom the signatory employer may subcontract." Applying this test, the Board would consider "work standards limitations on subcontracting" to be secondary in at least some contexts, notwithstanding what we said in *Retail Clerks* and in *District No. 9,* quoted in text *supra.*

graphs Four and Five, plus additional evidence concerning "the employees covered by the contract" and the specific facts surrounding any contemplated payments under Paragraph Five, including who will receive them and to whose benefit they are to inure. Based upon the principles here announced, the Board may then determine whether the threatened economic enforcement of Paragraph Five is primary or secondary activity. Jurisdiction will be retained to dispose of the case, when the record is returned. See Beck v. Federal Land Bank of Houston, 8 Cir., 146 F.2d 623 (1945); Twin City Milk Producers Ass'n v. McNutt, 8 Cir., 122 F.2d 564 (1941).

So ordered.