399 F.2d 977
 130 U.S.App.D.C. 244
 INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, Its
DISTRICTS 17 AND 28, and Its Locals 6594 and 6937,
Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Dixie Mining
Co., Dan S. Davison, Intervenors.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
BITUMINOUS COAL OPERATORS ASSOCIATION, Respondent,
International Union, United Mine Workers of
America, Its Districts 17 and 28, and
its Locals 6594 and 6937, Intervenors.
 Nos. 21129, 21226.
 United States Court of Appeals District of Columbia Circuit.
 Argued March 15, 1968.
Decided July 2, 1968, Petition for Rehearing Denied Oct. 9, 1968.
 
 Mr. Edward L. Carey, Washington, D.C., with whom Messrs. Harrison Combs and Willard P. Owens, Washington, D.C., were on the brief, for petitioners in No. 21,129 and intervenors in No. 21,226.
 Mr. Guy Farmer, Washington, D.C., with whom Mr. John A. McGuinn, Washington, D.C., was on the brief, for respondent in No. 21,226.
 Mr. Glen M. Bendixsen, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, and Marcel Mallet-Prevost, Asst. General Counsel, were on the brief, for petitioner in No. 21,226 and respondent in No. 21,129.
 Mr. Julian H. Singman, Washington, D.C., with whom Messrs. Orlin L. Livdahl, Jr., and Stephen M. Nassau, Washington, D.C., were on the brief, for intervenor Dixie Mining Co.
 Mr. J. Mack Swigert, Cincinnati, Ohio, of the bar of the Supreme Court of Ohio, pro hac vice, by special leave of court, with whom Messrs. Frank H. Stewart, Cincinnati, Ohio, and Stanley R. Strauss, Washington, D.C., were on the brief, for intervenor Dan S. Davision.
 Before BAZELON, Chief Judge, and WRIGHT and TAMM, Circuit judges.
 BAZELON, Chief Judge:
 
 
 1
 The question on this appeal relates to a clause of the National Bituminous Coal Wage Agreement of 1958, as amended, 1964, providing for an 80 cent per ton royalty payment to the Union's Welfare Fund on all bituminous coal procured or acquired for use or sale on which the 40 cents per ton royalty required by the union contract had not been paid.[1] The Board decided that this provision violated Section 8(e) of the National Labor Relations Act. It characterized the provision as 'a union signatory clause' and also found that the Union violated Section 8(b)(4)(i)(ii)(A) and (B) of the Act by requiring employers to become signators. The Union and the Bituminous Coal Operators appeal.
 
 
 2
 We first considered the 80 cent clause in Lewis v. NLRB.[2] There the Board sought enforcement of its orders which held that the union standards clause of the 1958 Agreement[3] and its successor, the 80 cent clause[4] violated Section 8(e). We remanded because while the case was pending, we had said that if a union standards clause was 'germane to the economic integrity of the principal work unit'[5] or if it sought to 'protect and preserve the work and standards (the union) has bargained for'[6] it did not violate Section 8(e). And we instructed the Board (1) to consider the effect of the union standards clause, (2) to determine the size of the unit to which it applied, and (3) to bear in mind the problems of 'substitute' and 'supplemental' coal in subcontracting in the bituminous coal industry.[7]
 
 
 3
 Upon remand the Board itself remanded the union standards clause to the Trial Examiner for further hearings. The Examiner found that the work unit in the bituminous coal industry was the bargaining unit and that the union standards clause was primary in effect and intent.[8] His decision, two years after our remand, was supported by exhibits presented by the General Counsel, illustrating subcontracting in the major signatory bargaining associations. The Examiner found that the union standards clause economically precluded most subcontracting outside of the bargaining unit and that the signatories actually had the capacity to produce most of the coal for which they contracted. He further found that nonsignatories were not 'compelled' to sign union agreements, since opportunities still remained for marketing their coal. Boyle is now pending before the Board.
 
 
 4
 Although the Board remanded the union standards clause, it construed Lewis to require no further consideration of the 80 cent clause. And no additional proceedings have been held on the 80 cent clause arising out of that action.
 
 
 5
 In the meantime this case developed independently on complaints of signatories who subcontract coal but are now economically forced to deal only with signatories, and certain nonsignatories, who claim the clause foreclosed subcontracts from signatories. The Board, upholding the Examiner, found that the 80 cent clause was a union signatory clause, designed to increase union jurisdiction. The Board also said that for the purposes of its 8(e) analysis, the 'bargaining unit' is the 'work unit' referred to in Orange Belt and other cases.[9]
 
 
 6
 The Union and the Bituminous Coal Operators Association now argue that the Board erred in equating work and bargaining units for all 8(e) purposes. Relying on the dissent of Board Member Jenkins in the first 80 cent clause case, the Union contends that the Welfare Fund is the industry-wide feature of a contract whose effect may otherwise be limited to the particular bargaining unit.[10] By seeking to maintain union work and penalizing the purchase of substitute coal from nonsignatories, the Union says it is really protecting an industry-wide interest of all its members. The BCOA argues that the contract is coextensive with the work unit, because the same contract, although negotiated with different bargaining units, covers the entire industry. Thus, they say that the clause properly protects union mining of coal and union jobs.
 
 
 7
 We need not reach the question of unit size at this time. Since the 80 cent clause is by everyone's admission and our characterization /11/ a substitute for the union standards clause, it is the Board's responsibility to carefully consider whether, in fact, it functions as one. If it is a union standards clause and the Board affirms Boyle, the 80 cent union standards clause would seem to be a valid provision. Conceivably the parties could have agreed on a money figure which in their judgment represents a broad equation for the difference in standards throught an industry of diverse production units. Certainly the figure of 80 cents had some meaning to the BCOA since they negotiated down from one dollar per ton. As Board Member Jenkins explained in his dissent:
 
 
 8
 A figure somewhat higher than the usual 40-cent royalty paid by nondelinquent Signatories would be justified because of the additional effort and expense in administering the clause and to offset the Welfare Fund's administrative expenses which are escaped by nonsignatories. The additional 40 cents also was assertedly intended to compensate to some extent for cost advantages enjoyed by nonsignatories on account of lower wages, less rigid safety standards, and the like. Consequently, it would appear that, in the absence of additional evidence, the clause should be regarded as no less than an effort to protect work standards by equalizing the labor costs between employees of Signatories and nonsignatories. Any degree of such equalization would, of course, tend to restrict purchases of coal from nonsignatories , which the Union admits. Nevertheless, this alone will not suffice to bring the clause within the proscription of Section 8(e).[12]
 
 
 9
 It is true that the Board found that this was not a union standards clause 'because a penalty is imposed whenever unit work is subcontracted to nonsignatory employers.'[13] But the Board's conclusion is not backstopped by the type of factual support developed by the Examiner in Boyle. It also appears contrary to the result in Boyle, which suggests that most nonsignatories have subunion wage, fringe and working condition standards. That is why before the union standards clause was in effect some signatories attempted to fulfill part of their contractual obligations through purchases of non-signatory substitute coal. Moreover, in contrast to the Examiner's findings here, the Examiner in Boyle found that nonsignatories were not foreclosed from marketing coal.
 
 
 10
 In view of these facts, and the history of the Union's efforts to deal with the problem of substitute coal through a union standards clause and its substitute 80 cent clause, the Board should have made a full inquiry into (1) the intent of the parties making this agreement, and (2) its validity as a surrogate union standards clause. We recognize that Lewis did not expressly signal the need for such an investigation. But this was certainly implicit in our remand since, as everyone apparently concedes, one clause is a substitute for the other. Accordingly, we remand for further consideration by the Board consistent with this opinion.
 
 
 
 [1]
 'During the life of this agreement there shall be paid into such Fund by each Operator signatory hereto the sum of 40 cents (40cents) per ton of two thousand (2,000) pounds on each ton of bituminous coal produced by such Operator for use or for sale. On all bituminous coal procured or acquired by any signatory Operator for use or for sale, (i.e., all bituminous coal other than that produced by such signatory Operator) there shall, during the life of this Agreement, be paid into such Fund by each such Operator signatory hereto or by any subsidiary or affiliate of such Operator signatory hereto to the sum of eighty cents (80cents) per ton of two thousand (2,000) pounds on each ton of such bituminous coal so procured or acquired on which the aforesaid sum of forty cents per ton had not been paid into said Fund prior to such procurement or acquisition.'
 
 
 [2]
 122 U.S.App.D.C. 18, 350 F.2d 801 (1965)
 
 
 [3]
 Raymond O. Lewis, et al., 144 N.L.R.B. 228 (1963)
 
 
 [4]
 Raymond O. Lewis, et al., 148 N.L.R.B. 249 (1964)
 
 
 [5]
 Orange Belt District Council, etc. v. NLRB, 117 U.S.App.D.C. 233, 237-238, 328 F.2d 534, 538-539 (1964)
 
 
 [6]
 Truck Drivers Union Local No. 413, etc. v. NLRB, 118 U.S.App.D.C. 149, 158, 334 F.2d 539, 548 (1964)
 
 
 [7]
 As we described the problem in Lewis, substitute coal is that coal purchased by an operator 'to substitute for coal (he) would ordinarily produce,' whereas 'supplemental coal' is that coal which an operator 'cannot produce in his own mines.' Lewis v. NLRB, supra note 2, 122 U.S.App.D.C. at 19, 350 F.2d at 802
 
 
 [8]
 W.A. Boyle, et al., NLRB case No. 5-CE-6, TXD-358-67 (June 29, 1967)
 
 
 [9]
 International Union, U.M.W. (Bituminous Coal Operators Association), 165 N.L.R.B. No. 49 (1967)
 
 
 [10]
 Member Jenkins said that: 'The welfare fund is administered under a single agreement, nationwide in scope, and separate from any agreement covering wages, hours, and other working conditions. It is executed by all employers having agreement with the Union and provides for a single system of administration, of employer contributions, and of eligibility and level of benefits for all employees. In these circumstances it would appear, contrary to the view of my colleagues, that there exists a single industry-wide bargaining unit for welfare fund matters.' 148 N.L.R.B. at 257
 
 
 [11]
 At footnote 2 in Lewis we said that 'the Union subsequently negotiated a contractual clause to substitute for that disputed here, and submitted it to the Board with a request that it be found in compliance.'
 
 
 [12]
 148 N.L.R.B. at 257, footnote 23
 
 
 [13]
 International Union, U.M.W., supra note 9